**Jason CLEMENTS, Petitioner,**

v.

**Howard W. CLARKE, Respondent.**

**Civil Action No. 03–10377–GAO.**

United States District Court,
D. Massachusetts.

March 31, 2009.

Jason Clements, pro se.

Rosemary C. Scapicchio, Law Office of Rosemary C. Scapicchio, Four Longfellow Place, Boston, MA, for Petitioner.

Randall E. Ravitz, Susanne G. Reardon, Office of the Attorney General, Boston, MA, for Respondent.

## OPINION AND ORDER

O'TOOLE, District Judge.

### I. Introduction

The petitioner, Jason Clements, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Clements and his co-defendant, Kenneth Mattox, were tried jointly in the Massachusetts Superior Court on multiple charges arising from the fatal shooting of one Gregory Tillery on January 30, 1995, in Dorchester, Massachusetts. The jury convicted Clements of murder in the second degree as a joint venturer and armed assault with intent to murder as a principal, as well as unlicensed possession of a firearm. Mattox, Clements' alleged joint venturer, was acquitted by the jury of all charges. The prior history and facts of the case are amply set out in prior reported decisions. *See Clements v. Maloney*, 485 F.3d 158 (1st Cir.2007) (*Clements IV*); *Clements v. Maloney*, 359 F.Supp.2d 2 (D.Mass.2005) (*Clements III*); *Commonwealth v. Clements*, 436 Mass. 190, 763 N.E.2d 55 (2002) (*Clements II*); *Commonwealth v. Clements*, 51 Mass.App.Ct. 508, 747 N.E.2d 682 (2001) (*Clements I*).

The petition presents two claims, each arising under the Sixth Amendment to the United States Constitution as it is made applicable to the States by the Fourteenth Amendment: first, whether the admission of a witness's grand jury testimony identifying Clements as a shooter violated his rights under the Confrontation Clause, and second, whether the trial judge's interactions with the deliberating jury violated the guaranty of a fair trial before an impartial jury. In each case, the parties dispute not only the ultimate merits of the claim, but also the applicable standard for habeas review.

### II. Grand Jury Testimony and the Confrontation Clause

A central witness at Clements' trial was Sakoya Willis, who was a friend of the victim, Tillery, and who was acquainted with Clements. In his trial testimony before the jury, Willis testified that he was not able to identify the person who shot

Tillery. He further testified that he had never known who the shooter was. *Clements II*, 763 N.E.2d at 57. The prosecution, which had called him as a witness, then impeached him with his own prior statements that were inconsistent with his professed inability to identify the shooter. Willis acknowledged that prior to trial he had identified Clements from a photo array as the assailant and that he had given a recorded statement to the police to that effect. *Id.* He also acknowledged that he had identified Clements as the shooter in his testimony before the grand jury. *Id.* He offered several explanations for his previous statements identifying Clements, but he maintained before the jury that he did not know who the shooter was. *See id.* After Willis completed his testimony and with the court's approval, the prosecution read into evidence excerpts from Willis's grand jury testimony in which he identified Clements as the person who shot Tillery. *Id.*

■ The grand jury testimony was admitted pursuant to a state evidentiary rule of admissibility announced in *Commonwealth v. Daye*, 393 Mass. 55, 469 N.E.2d 483 (1984). In *Daye*, the Massachusetts Supreme Judicial Court ("SJC") held that a witness's prior inconsistent statement may be admitted as substantive evidence if (i) the declarant—witness is subject to cross-examination at trial concerning the prior statement, (ii) the prior statement had not been coerced, and (iii) the statement was more than merely a perfunctory assent to a leading question but was actually the witness's own statement. *See Clements II*, 763 N.E.2d at 57–58; *Daye*, 469 N.E.2d 483, 495–96.

In his argument on the merits of the petition, Clements asserts that his right to confront witnesses against him was violated because Willis's grand jury testimony was formally admitted and read to the jury after Willis had completed his trial testimony. He contends that this sequencing of the evidence denied him the opportunity to cross-examine Willis about the grand jury testimony.[1] Before turning to the

---

1. Clements' claim about the admission of the grand jury testimony has been phrased differently in different submissions by him to different courts, and as a result it has been difficult to fix exactly what the substance of the claim is. I had originally construed it as a state law claim that the *Daye* rule had been wrongly applied to admit the grand jury testimony. *See Clements III*, 359 F.Supp.2d at 7–9. The Court of Appeals concluded, however, that although the claim was phrased and argued to the SJC in state law terms only, Clements had referred to the Sixth Amendment in his argument of the same point to the intermediate Massachusetts Appeals Court, and under Massachusetts procedural rules then applicable, this was sufficient for exhaustion of remedies purposes to raise the federal character of the claim to the SJC. *See Clements IV*, 485 F.3d at 167–68. The potential for confusion persists, however, because Clements posed the issue of Willis's grand jury testimony differently in his papers before the Massachusetts appellate courts. In his Application for Leave to Obtain Further Appellate Review ("ALOFAR") submitted to the SJC, he phrased the issue this way:

> Whether the Appeals Court's decision holding that inconsistent, recanted extrajudicial statements of identification constituting the sole evidence of guilt is sufficient to convict pursuant to *Commonwealth v. Daye*, 393 Mass. 55, 469 N.E.2d 483 (1984)?

*Clements IV*, 485 F.3d at 160 n. 2. For an obvious reason, the Court of Appeals referred in shorthand to this as a "sufficiency claim." The prior statement of the claim to the Appeals Court that contained the reference to federal law, however, had phrased the claim somewhat differently:

> The Court violated Clement's [sic] rights pursuant to the Sixth and Fourteenth Amendments as well as Article XII of the Massachusetts Declaration of Rights, when it held at trial and on the motion for a new trial that the jury could consider Willis' grand jury identification as substantive evidence of Clement's [sic] guilt.

merits of this claim, I address the parties' disagreements as to whether this claim should be deemed procedurally defaulted and, if not, whether the SJC adjudicated the federal claim on merits within the meaning of 28 U.S.C. § 2254(d), so that the statutory standard of review applies.

### A. Procedural Default and "Adjudicated on the Merits"

The respondent argues that the petitioner is barred from obtaining habeas relief on the basis of his Confrontation Clause claim because it was rejected by the SJC on an independent and adequate state ground, namely, the enforcement of a state procedural rule requiring a contemporaneous objection to preserve an issue for appeal on the merits. *See Coleman v. Thompson,* 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

In considering whether the first criterion for admissibility under *Daye* was met—whether Willis was available for cross-examination regarding the prior testimony—the SJC explained:

> It was clear from Willis's direct examination that his testimony before the grand jury was a subject of contention. A lengthy bench conference was held on the subject just prior to cross-examination. Indeed, defense counsel cross-examined Willis regarding his grand jury testimony and the judge ruled immediately after counsel's cross-examination of Willis, and *before* counsel's recross-examination, that the inconsistent portions of the grand jury testimony could be read to the jury by the prosecutor. Moreover, the defendant did not object on this basis until the following day and he did not seek to recall Willis at any time.

*Clements II,* 763 N.E.2d at 59 (emphasis in original). The respondent argues that by noting the defendant's late objection, the SJC invoked Massachusetts's contemporaneous objection rule as an alternative independent basis for its decision, and therefore the petitioner's claim is procedurally

---

*Id.* at 168. In this formulation, the emphasis is not on the sufficiency of the evidence to support a conviction, but rather on the propriety of admitting the evidence in the first place—whether the jury "could consider" the grand jury testimony as "substantive evidence."

The difference is significant because it points to different potential federal constitutional claims. On the one hand, a claim that the evidence, even if admitted, was not sufficient to support a conviction could find support in the principle articulated in *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that an "applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt"). On the other hand, a claim that the jury should not have been permitted to consider the prior statements because there had been an inadequate or nonexistent opportunity for cross-examination of the declarant would invoke the principles summed up and discussed in *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), where the Supreme Court found no error in the admission of prior statements of a witness "who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." *Id.* at 164, 90 S.Ct. 1930. Clements' phrasing of his claim in his ALOFAR sounds more like the former argument; his phrasing of the claim to the Appeals Court sounds more like the latter.

In both his brief and his counsel's oral argument on the present petition, Clements has made clear that his claim is, indeed, the latter claim. (*See* Pet'r's Brief in Supp. of his Request for Relief Pursuant to 28 U.S.C. Sec. 2254, at 40–48.) In response to a question from the bench during oral argument, counsel unequivocally disavowed a "sufficiency of the evidence" claim under *Jackson.*

defaulted. *See Coleman*, 501 U.S. at 734–35, 111 S.Ct. 2546; *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir.1995) ("A defendant's failure to object in a timely manner at his state criminal trial may constitute an adequate and independent state ground sufficient to trigger the bar rule so long as the state has a consistently applied contemporaneous objection requirement and the state court has not waived it in the particular case by resting its decision on some other ground.")

■ The parties also disagree about the proper standard of review. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1213, provides that when a claim has been "adjudicated on the merits" by a state court, a petition for a writ of habeas corpus based on that claim cannot be granted "unless the adjudication of the claim ..." by the state court either "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States ..." or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, if the state court did not decide the federal constitutional claim but instead adjudicated the claim only on state law grounds, the claim has not been "adjudicated on the merits" within the meaning of § 2254 and a habeas court may undertake a *de novo* review. *See DiBenedetto v. Hall*, 272 F.3d 1, 6–7 (1st Cir.2001); *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001).

As to both issues—whether the grand jury testimony claim was procedurally defaulted and whether the SJC adjudicated it on the merits within the meaning of § 2254(d)—the arguments of both parties ignore the important point that the SJC did not explicitly address the petitioner's Confrontation Clause claim at all. *See Clements II*, 763 N.E.2d at 58–59. The SJC's discussion was focused entirely on the state law claim that the grand jury testimony did not qualify for admission under *Daye*'s admissibility requirements (availability for cross-examination, lack of coercion, and more than a mere confirmation or denial) and sufficiency requirement (if the prior testimony concerns an essential element of the crime, there must be other corroborating evidence to support a conviction). *See id.* at 57–59; *see also Clements III*, 359 F.Supp.2d at 9 (explaining that the petitioner's argument to the SJC "was couched in terms of state law only," and that "[t]he SJC clearly read the argument that way...."

■ Because the SJC did not consider Clements' Confrontation Clause claim, the SJC's statement, made in the course of rejecting the separate state law argument, that Clements had failed to make a timely objection to the admission of the grand jury testimony clearly did not result in the procedural default of the federal claim. It also follows from the fact that, because the SJC did not address the federal claim, that federal claim was not "adjudicated on the merits" within the meaning of § 2254(d), even though it has been deemed exhausted for habeas purposes. Accordingly, the standard of review in § 2254(d) is inapplicable, and the claim is now subject to review *de novo*. *See Fortini*, 257 F.3d at 47.

### B. Merits of the Confrontation Clause Claim

■ Clements' argument under the Confrontation Clause is that the admission of Willis's prior grand jury testimony was improper because the conditions for admission of such testimony set out in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930,

26 L.Ed.2d 489 (1970) were not satisfied.[2] In particular, he argues that Willis was not available for cross-examination about his grand jury testimony because the prosecution only introduced the grand jury testimony after Willis had been excused from the stand as a witness.

The conditions set by *Green* for admission of prior inconsistent statements of a witness concern substance, not timing. Clements had a full opportunity to cross-examine Willis about the grand jury testimony, even though that testimony was not actually admitted prior to the cross-examination. The issue of the admission of Willis's grand jury testimony had been discussed with the trial judge, who had indicated that it would be admitted. Clements and his counsel had the transcript of the grand jury testimony. Clements' counsel not only had a full opportunity to cross-examine Willis regarding that recorded testimony, he actually did so. Indeed, there may even have been some advantage to him in having an opportunity to denigrate the grand jury testimony before the jury heard it. There was no request by counsel to recall Willis to the stand after the grand jury testimony was presented, but there really was no need to, since the cross-examination had already occurred.

The requirements of the Confrontation Clause as articulated in *Green* were met, and the petitioner is not entitled to a writ of habeas corpus on the basis of this claim.

### III. Coerced Verdict Claim

Clements claims that his right to a fair trial was violated because the trial judge improperly invaded the province of the jury and unintentionally but effectively coerced a guilty verdict. In brief, on the fourth day of the jury's deliberations, the judge received a note from one or more jurors reporting that a fellow juror was "biased." The judge felt obliged to conduct an individual voir dire of the jurors to investigate the suggestion of bias. In the course of interviewing the jurors, it became apparent that the jury stood eleven-to-one in favor of conviction. It also became apparent that the holdout juror had not expressed "bias" but rather her unwillingness to convict. Clements argues that the trial judge's conduct of the voir dire and her related instructions to the jury, coupled with the judge's refusal to accept the jurors' reports of impasse, had the effect of endorsing the majority's view and encouraging the holdout juror to give in to that view.

#### A. Standard of Review

This coerced verdict claim was presented to the SJC in Clements' ALOFAR, but the court did not accept the issue for review. Where the highest state court has denied review of a petitioner's claim, a habeas court must " 'look through' to the 'last reasoned decision' " addressing that claim to determine the basis for the state court's ruling. *Malone v. Clarke*, 536 F.3d 54, 63 n. 6 (1st Cir.2008) (quoting *Gunter v. Maloney*, 291 F.3d 74, 80 (1st Cir.2002)). The last reasoned decision as to the coerced verdict claim was that of the Massachusetts Appeals Court. Rejecting the claim, that court stated:

> Contrary to the defendant's contention, the trial judge did not invade the autonomy of the jurors' deliberations. After

---

**2.** *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) was decided after Clements' conviction became final and does not apply retroactively to cases on collateral review. *See Whorton v. Bockting*, 549 U.S. 406, 415, 421, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Nor would *Crawford*, if applicable, change the result in this particular case. *See* 541 U.S. at 59, 124 S.Ct. 1354.

the judge received a note from the jury indicating that one of the jurors allegedly had made a biased statement, the judge properly conduct an individual voir dire with each juror. *See Commonwealth v. Laguer*, 410 Mass. 89, 97, 571 N.E.2d 371 (1991). After finding no bias, she ordered the jury to continue with their deliberations.

During the course of the voir dire, the judge learned that eleven jurors favored conviction, while one juror favored acquittal. The defendant argues that the judge's directive to the jury to continue to deliberations may have been interpreted by the jury as an implicit endorsement of the majority position over the one juror who favored acquittal. *See Commonwealth v. Gonzalez*, 28 Mass.App.Ct. 10, 14–15, 545 N.E.2d 862 (1989).

The record shows no impropriety by the judge. The transcript indicates that she was not coercive, did not attempt to influence their judgment, and in no way intimated to the jurors that she agreed or disagreed with their positions. She merely informed the jurors that she had found no evidence of juror bias and that they should continue to deliberate.

*Clements I,* 747 N.E.2d at 694.

■ The parties dispute whether the Appeals Court adjudicated Clements' *federal* claim on the merits such that AEDPA's standard of review applies. *See* 28 U.S.C. § 2254(d). In its decision, the Appeals Court cited only Massachusetts law in considering claim and rejecting the coerced verdict claim. *Clements I,* 747 N.E.2d at 694. The court made no reference to federal constitutional law in its discussion of the issue.

The respondent argues that the Appeals Court adjudicated the federal coerced verdict claim on the merits because it relied on *Commonwealth v. Laguer*, 410 Mass. 89, 571 N.E.2d 371, 376 (1991), a decision in which the SJC authorized voir dire examination of jurors during or after deliberation to determine the whether ethnic bias might have affected the jury. *Laguer* cited two federal cases in passing, and on that basis the respondent suggests that the Appeals Court in *Clements II* must have evaluated the claim by reference to federal principles, notwithstanding no explicit discussion of such principles. It is true that it can sometimes be determined that a federal claim has been adjudicated where the discussion of state law principles includes at least reference to, if not discussion of, analog or precursor federal principles. *See DiBenedetto v. Hall,* 272 F.3d 1, 6 (1st Cir.2001) (suggesting, by negative implication, that reference to state cases dealing with federal issues may indicate adjudication of federal claim).

Here, the argument is almost frivolous. *Laguer* involved an attempt to impeach a jury verdict by a proffer of evidence that one of the jurors had made statements indicating ethnic bias toward the defendant. Under Massachusetts law, "the subjective mental processes of jurors, such as the reasons for their decisions" may not be inquired into, although "extraneous influences" may. *See Laguer,* 571 N.E.2d at 375–76. *Laguer* authorized a limited exception to the rule to permit a hearing to determine whether the presence of ethnic bias in the jury had prevented the defendant from receiving "a trial by an impartial jury, which was his fundamental right." *Id.* at 376. The court then cited *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) for the general proposition, "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." 571 N.E.2d at 376. *Irvin* involved the question whether extensive pretrial publicity had prevented the defendant from re-

ceiving a trial before an impartial jury. It had nothing to do with judicial inquiry of deliberating jurors or the possibility of judicial pressure on an undecided jury to render a verdict. Even if such a brief reference to a federal case could be taken to mean that the state court had resolved a federal issue, the federal issue resolved would have to be the one addressed in the cited case. The citation of *Irvin* does not mean that the federal claim was adjudicated on the merits, and the deferential statutory standard of review is inapplicable.[3] Review is *de novo*. *Fortini*, 257 F.3d at 47.

■ Even when the standard of review is *de novo*, a habeas court's review remains subject to other limitations. The state court's factual determinations are entitled to the presumption of correctness set forth in 28 U.S.C. § 2254(e)(1), *see Pike v. Guarino*, 492 F.3d 61, 68 (1st Cir.2007), and the petitioner's claims are also limited by *Teague's* bar of habeas claims seeking the announcement or retroactive application of new rules of law. *Kater v. Maloney*, 459 F.3d 56, 58, 63 (1st Cir.2006); *see Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). Furthermore, even if a constitutional violation occurred, habeas corpus relief can only be granted on the basis of a "trial type" error if that error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38,

113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### B. The Right to an Uncoerced Jury Verdict

■ The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury" U.S. Const. amend. VI. The protections of the Sixth Amendment are made applicable to state prosecutions by the Fourteenth Amendment. *See Duncan v. Louisiana*, 391 U.S. 145, 149–50, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). A necessary corollary to the right to a jury trial is that a defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).[4]

Two cases help illustrate what might be deemed "coercion" of a verdict. In *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam), the jury in a federal criminal trial, after deliberating for two hours, sent a note to the judge indicating they could not agree on a verdict. The judge responded, "You have got to reach a decision in this case." The Supreme Court held that the judge's response had a coercive effect on the jury. The Court stated that "in its context and under all the circumstances the judge's statement had to coercive ef-

---

3. The other federal case cited in *Laguer* was *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The *Smith* case was cited in support of the proposition that "there may be instances in which a juror's personal interest in the outcome of a case may be explored and determined after the fact." *Laguer*, 571 N.E.2d at 377. That proposition has nothing to do with the coerced verdict claim made here, and it certainly does not support an argument that a federal claim on

the ground that the verdict was coerced was adjudicated on the merits in *Clements I*.

4. *Lowenfield* was a habeas case in which the claim was made that the state court had improperly coerced a guilty verdict. Although the Court concluded that there had been no constitutional violation because the verdict had not been coerced, it acknowledged that other circumstances could require a different conclusion. 484 U.S. at 241, 108 S.Ct. 546.

fect attributed to it," and reversed the conviction.

In *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 432, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the federal district judge presiding over the criminal trial conferred *ex parte* with the jury foreman, who advised the court that the jury was unable to reach a verdict after five days of deliberations and that further deliberations would not likely eliminate the impasse. The judge told the foreman that he wanted the jury to continue deliberations, and the following colloquy occurred:

> THE COURT. I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me. That is all I can say.
>
> MR. RUSSELL. I appreciate it. It is a situation I don't know how to help you get what you are after.
>
> THE COURT. Oh, I am not after anything.
>
> MR. RUSSELL. You are after a verdict one way or the other.
>
> THE COURT. Which way it goes doesn't make any difference to me.

*Id.* The Court concluded that there was a "strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict 'one way or the other.'" *Id.* at 460, 98 S.Ct. 2864. Although it was impossible to know what role the meeting may have played in the jury's deliberations, "the swift resolution of the issues in the face of positive prior indica-

tions of hopeless deadlock, at the very least, gives rise to serious questions in this regard." *Id.* at 462, 98 S.Ct. 2864. The Court noted its holding in *Jenkins* that an instruction directing the jury that it had to reach a verdict was reversible error. *Id.* In the meeting with the foreman, the judge had essentially implied what had been explicitly stated in *Jenkins*. *See id.* The Court held that the reasoning of *Jenkins* applied, and therefore that reversal of the conviction was required. *Id.*

In *Lowenfield,* the Court explained that its rulings in *Jenkins* and *Brasfield* were based on its supervisory power over the federal courts, not on constitutional grounds. *Lowenfield,* 484 U.S. at 239 n. 2, 240 & n. 3, 108 S.Ct. 546 (1988). Nonetheless, those cases illustrate some factual circumstances that would warrant a conclusion that jury coercion had occurred. And *Lowenfield* clearly indicates that a state court's coercion of a guilty verdict could, in appropriate circumstances, "deny [a] petitioner [a] constitutional right." *Id.* at 241, 108 S.Ct. 546.[5]

### C. The Relevant Events

The following chronology of the events occurring during the period of the jury's deliberations is taken from the trial transcript. (*See* Resp't's Third Supp. Ans. Ex. C; Resp't's Second Supp. Ans. Ex. C [hereinafter collectively referred to as Trial Tr.].) The jury was instructed on the afternoon of Monday, January 26, 1998. (*Id.* 5:96.)[6] The instructions ended at 3:00

---

**5.** As a collateral argument, the petitioner contends that the judge improperly inquired as to the division among the jurors. That is not an accurate characterization of the record. What is accurate is that she learned of the division in the course of her inquiry into the presence of bias, but she did not seek that information. "[I]t is not reversible error for the jury to reveal its division voluntarily." *United States v. Rengifo*, 789 F.2d 975, 985 (1st Cir.1986). In any event, the rule in the

federal courts against judicial inquiry into the numerical division of the jury is one adopted under the Supreme Court's supervisory authority over the federal courts, not one mandated by the Constitution. *Lowenfield*, 484 U.S. at 239 n. 3, 240, 108 S.Ct. 546.

**6.** The citation is to the volume (5) and page (96) of the transcript.

p.m., and the jury began its deliberations, which continued for an hour before the day's end. (*Id.* 5:164–65, 6:10.) When deliberations resumed the next morning, the jury sent a note requesting Willis's trial testimony, followed by a second note asking a question about the theory of joint venture. (*Id.* 6:3, 6:4.) At 2:30 p.m., the court received a note from the jury stating that it was deadlocked. (*Id.* 6:10–11.) The judge returned the note to the jury with a written instruction to keep deliberating, and deliberations continued for the remainder of the day. (*Id.* 6:12.)

The jury resumed deliberations at 9:30 a.m. on Wednesday. (*Id.* 7:3.) The jury requested to see the live rounds of ammunition found at the crime scene, as well as a transcript of the testimony of a detective regarding ballistic evidence. (*Id.*) The ammunition was displayed to the jury by a court officer, but the judge returned the note to the jury with the statement that the transcript of the detective's testimony was not yet available and that they should rely on their collective memory of the testimony. (*Id.* 7:4.) Soon thereafter, the jury again notified the court that it was deadlocked on all charges. (*Id.* 7:4–5.) The court responded by giving instructions approved under Massachusetts law for the circumstance of a jury reporting inability to agree, commonly referred to as a "*Tuey–Rodriquez* charge." (*Id.* 7:5–9) *See Commonwealth v. Rodriquez*, 364 Mass. 87, 300 N.E.2d 192, 202–203 (1973); *Commonwealth v. Tuey*, 62 Mass. 1, 8 Cush. 1, 2–3 (1851).[7] The jury resumed delibera-

7. The judge instructed the jury:

Ladies and gentlemen, I have received a note from your foreperson which indicates that the jury is deadlocked. I would like to say the following to you.

The principal mode provided by our constitution and our laws for deciding questions of fact in criminal cases is by the verdict of a jury. In a large proportion of cases and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained nor is it expected, although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions and not a mere acquiescence in the conclusions of the fellow[ ] jurors. Yet, in order to bring 12 minds to a unanimous result, you must examine the questions that have been submitted to you with honesty and candor and with the proper regard to the opinions of each other.

You should consider that it is desirable that the case be decided, that you are selected in the same manner and from the same source from which any future jury would be selected and that there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial, or more competent to decide this case or that more or clearer evidence will ever be produced on the one side or the other; and, with this view, it is your duty to decide the case if you can conscientiously do so.

In order to make a decision more practicable, the law puts a burden of proof on one party or the other in all cases. In this case, the burden of proof is on the Commonwealth to establish every part of the case beyond a reasonable doubt; and, if any part of it you are left in doubt, then the defendant is entitled to the benefit of that doubt and he or they must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments.

Thus, where there is disagreement, jurors for acquittal should consider whether a doubt in their own minds is a reasonable one which makes no impression on the minds of others equally honest, equally intelligent with themselves, and who have heard the same evidence with the same attention and with an equal desire to arrive at the truth and, finally, under the sanction of the same oath.

On the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry

tions but then, upon their request, were excused early for the day. (Trial Tr. 7:9–10.)

On Thursday morning, January 29, the court received two notes from the jury before deliberations had resumed. (*Id.* 8:3.) One note concerned a juror whose wife had an important medical appointment the following day. (*Id.*) The other note, from Juror No. 4, stated that, "One person is not competent enough to be on this jury." (*Id.* 8:4.) The judge noted that Juror No. 4 had previously indicated he was a full-time dental student and was concerned about the trial schedule. (*Id.*) The court interviewed Juror No. 4, who indicated that the jury deliberations did not "seem to be going anywhere," and that they were at "a big impasse." (*Id.* 8:10.) The court instructed the juror not to reveal anything more about deliberations. (*Id.* 8:10.) Juror No. 4 also expressed that he was feeling pressure from not being able to attend to his patients, but that he could continue to deliberate. (*Id.* 8:11.) The court then instructed the entire jury to resume its deliberations. (*Id.*)

Somewhat later, the court received another note that stated, "Upon further investigating, a statement made by one of the jurors is biased; and we would like to speak to the Judge concerning this extreme." (*Id.* 8:12.) The note was signed by Juror No. 9, who also wrote that the "Foreman refused to sign it." (*Id.*) The judge suspected that Juror No. 4 had actually written the note, perhaps because of the similarity of the handwriting to that on the previous note received from him. (*Id.*) Having received this note indicating the possibility of bias in the jury deliberations,

and probably having in mind the *Laguer* case, the judge then undertook to conduct an individual voir dire of each juror to ascertain what each may have heard that might qualify as evidence of "bias." (*Id.*)

The judge asked the first juror interviewed if she had heard something that she considered to be biased. (*Id.* 8:17.) The juror responded that "one of the jurors say, well, I don't feel that—I feel that if they go to jail then he ought to go to jail, too, talking about one of the witnesses. So we assumed—take that as a bias statement." (*Id.*) The judge asked, "Do you feel that that statement by the juror is going to interfere with your ability to decide the case fairly on the evidence?" (*Id.* 8:17–18.) The juror responded that it would, because "for the last four days it's been the same one person that none of us can reach. And, when she made the statement, that led us to believe this is what she's been thinking all the time." (*Id.* 8:18). The juror elaborated: "What she said was, why should I put two innocent guys in jail when I believe the witness should be in jail himself. So she assume— you know, she figure that all of them should be in jail or they should be set free because she doesn't believe this witness." She further said that the other juror's statement would interfere with her ability to decide the case fairly "because for the last four days, this certain person been the holdup. We only discussed one person. We haven't been able to move forward to the second person." (*Id.* 8:18–19.)

After the juror left, the prosecutor commented that the juror "thinks it's going to interfere, it's going to hold up whether or not there is a verdict, not whether or not

conviction to the minds of their fellow jurors.

So I am saying to you, ladies and gentlemen, I would like you to keep in mind what I have just instructed you and return to the jury room to consider what I have said and to consider whether to further deliberate. With that, I am going to let you go.
(Trial Tr. 7:7–9.)

it's going to interfere with her own personal ability to remain fair and impartial." (*Id.* 8:19–20.) Mattox's counsel pointed out that the so-called biased statement was actually "a statement that concerns, really, one person's opinion about testimony," and suggested, "I just don't know if we should—now that we know what the statement is that we should continue with this inquiry." (*Id.* 8:20.) The judge agreed that, so far as reported by the first juror, the statement did not seem to be one involving bias. (*See id.* 8:20–21.) The judge concluded, however, that she should inquire of at least one more juror to confirm or contradict this impression. (*See id.* 8:22.)

Juror No. 4 was the next juror to be interviewed. (*Id.*) The following colloquy occurred:

THE COURT: Mr. Tau, I received this communication which may be from you. I don't know. But, in any event, it indicates that there was a statement by a juror that was biased. And I guess my question to you is did you hear something that in your view indicated bias or prejudice on the part of a juror? That's Question No. 1.

JUROR: Yes. One hundred percent positive of that fact.

THE COURT: And what is the statement that you considered to be biased or prejudiced?

JUROR: We were discussing the reason we were at an impasse. And the juror—do you want me to give a name—the juror who was one of the people who was in the—against the majority of the rest of the people basically said that she could not basically believe Sakoya Willis' testimony because of the fact that she believes he should go to jail and she cannot convict two defendants on that, basically, because Sakoya Willis has no punishment towards him. So, basically,

she believes that the witness is not credible for that reason.

THE COURT: So explain to me what you see as the bias.

JUROR: Basically, she would not convict the two defendants because she believes Sakoya Willis deserves to go to jail, as well. And that was clean out, simple as can be, stated to all of us; and all of us heard it.

THE COURT: Do you think that this statement by her will interfere with your own ability to fairly deliberate on the evidence in the case?

JUROR: My own ability?

THE COURT: Yes.

JUROR: No, not at all. It won't affect my ability. I think it affected her ability.

THE COURT: All right. So you think, as far as you are concerned, you can continue to deliberate—

JUROR: I have no problem. It has not changed my mind in the case. I believe that—

THE COURT: Okay. Don't tell us what you believe. But you think you can fairly—

JUROR: I have no problem continuing deliberating on this case.

THE COURT: All right. Thank you. (*Id.* 8:22–24.) Following this exchange, Clements' attorney moved for a mistrial on the basis of the evident impasse. (*Id.* 8:24.) Mattox's attorney joined in the motion, noting that it was clear that the problem was that there was one holdout juror and adding that they had "heard nothing about improper activity or bias on the part of that one juror." (*Id.* 8:25–26.) The court then determined that the process of inquiring of each juror having begun, it should be completed. (*Id.* 8:26.) The attorneys for both defendants objected to further inquiry. (*Id.*)

Juror No. 5 was interviewed next. (*Id.* 8:27.) When asked if he had heard any biased statement, he stated that he had "heard what you are referring to," suggesting some personal reservation about whether the statement was really about "bias." (*See id.*) He continued: "One of the jurors made a statement that—something to the effect that I can't put two young men in jail when I think the person who is giving the testimony should be in jail, also. Something to that effect." (*Id.*) The judge asked if his having heard that statement would interfere with his own ability to deliberate on the case and consider fairly the evidence, and the juror responded that it would not "affect my decision or my feelings whatsoever...." (*Id.*) After the juror was returned to the jury room, Clements' attorney objected and stated that the juror's statement "exactly goes to the heart of deliberations in that a person could discuss credibility .... The Court, respectfully, I believe, was acting and directing this juror to put aside statements made by another juror in reference to the credibility for a particular witness. And, respectfully, I believe it's unduly influencing this juror." (*Id.* 8:28.)

Juror No. 7 also stated that she had heard a statement that reflected bias or prejudice, and identified the statement as "that they couldn't convict anybody of anything when they thought one of the witnesses should have been in jail, themselves." (*Id.* 8:29.) The judge followed up:

THE COURT: Do you feel that you, yourself, are able to fairly deliberate in this case and consider the evidence that you've heard and be fair to all sides and make your decision based on the evidence?

JUROR: Yes.

THE COURT: So that the deliberations, as far as you are concerned, have not interfered with your own ability to deliberate fairly and impartially?

JUROR: Correct.

(*Id.* 8:29–30.)

The next juror interviewed (also dubbed Juror No. 7 in the transcript) was the foreman and apparently the holdout that the other jurors were complaining about. (*See id.* 8:30–31.) The judge asked if she had heard a statement made by any juror that she thought was biased or prejudiced she replied:

THE JUROR: No, your Honor. I haven't. And I am the only juror that is not—I have ruled not guilty.

THE COURT: I really don't want to hear about your deliberations.

JUROR: Okay.

THE COURT: But, in your view, there is nothing that has reflected bias or prejudice?

JUROR: No.

THE COURT: Okay. And do you think that your own ability to deliberate fairly on the evidence, fair to both the Commonwealth and the defendants, in making your decision on the evidence has been affected in any way by any statements made by the jurors as part of these deliberations?

THE JUROR: No.

(*Id.*)

The next juror interviewed stated that she had "absolutely" heard a statement that was biased or prejudiced and had made note of it:

JUROR: This is a quote. "I don't find Sakoya to be a credible witness," which is fine. I mean—okay. "I don't find Sakoya to be a credible witness. How can I put two young men in jail when he, Sakoya, probably should be in jail, himself." And I can tell you that when those words were uttered, everybody just went, whoa, just staggered.

No one has said anything like that in four days.

THE COURT: Do you think that your own ability to deliberate fairly on the evidence, make your decision on the evidence, has been interfered with by anything that has been stated as part of your deliberations? I mean, I understand you may not agree with particular jurors, but your own ability to deliberate and focus your deliberation only on the evidence.

JUROR: For myself?

THE COURT: Yes. I think I've been doing that right along.[8]

THE COURT: You think you can do that?

JUROR: I think I can do that.

THE COURT: All right.

JUROR: I just feel that the atmosphere has been tainted. And I don't know how much more you want me to say.

THE COURT: No. I don't think I want you to say anything more. Okay. Thank you.

(*Id.* 8:32.)

The juror who had signed the note was interviewed next. (*Id.* 8:34.) She said that she did consider a statement made by one of the jurors to be biased:

JUROR: She said that she couldn't convict the two defendants without—she couldn't convict the two defendants, saying that the—the witness testimony without—I can't—she couldn't convict the two defendants because the witness should also be in jail, or something like that. I can't put it together.

THE COURT: Do you think that your own ability to deliberate fairly in this case, focus and confine yourself to deliberating on the evidence, has been affected by what has transpired?

JUROR: Yes.

THE COURT: You think it—in what way has it been affected?

JUROR: The state of mind that—just saying the thought, itself—you know, she's not looking at evidence. The person is not looking at evidence. They are putting a statement in that shouldn't be there that's keeping us—

THE COURT: Okay. Thank you.

(*Id.* 8:34–35.)

The next juror interviewed told the judge that he had heard a statement that was biased or prejudiced:

JUROR: One of the people on the jury said, I refuse to send anyone to jail when someone else isn't going to jail, or something to that effect.

THE COURT: Okay. Do you think that what has happened in the jury has in any way interfered with your ability to listen to the evidence—to decide the case based on your view of the evidence and to focus on the evidence and base your decision on the evidence?

JUROR: I believe it also seems to myself from day one they dug in their heels and stuck to their guns and the person refused to kind of collect everyone's, you know, recollection of what happened.

THE COURT: Okay. Well, let me just ask you again. So you are describing kind of a process. But, for you, yourself, do you feel that you have been affected so that you cannot deliberate fairly anymore?

JUROR: I believe so, yes.

---

8. So in the transcript. It seems likely that it was the juror who said, "I think I've been doing that all along."

THE COURT: And in what way have you been affected so that you can't deliberate fairly?

JUROR: Because of the person's views. I mean, if they're going to be steadfast and adamant on the statement they made, there is just no sense of even bringing out your thoughts because they refuse to listen to anything else.

THE COURT: Okay. Thanks very much.

(*Id.* 8:36–37.)

In response the judge's same question about bias, the next juror, Juror No. 11, identified the same remark. (*Id.* 8:37–38.) The judge asked if her ability to deliberate and reach a verdict based on the evidence fairly had been affected, and the juror said that it had been, because there was "enough evidence . . . to base a case on." (*Id.* 8:38.) The judge asked whether "in terms of your own ability to be a fair juror and make a judgment on the evidence, do you think that what has happened in the jury room has somehow had an impact on you so you can't do that anymore?" (*Id.*) The juror replied, "I think I can do it, yes." (*Id.*)

The next juror interviewed indicated that the jury was deadlocked:

JUROR: Discussing with the jurors their views on the case, and the statement come up that the prosecution did not present enough evidence and she's not going to send two men to jail or they're not going to send two men to jail when they feel the other person, which is Mr. Willis, should be in jail, also. And everybody at the time just threw their hands up and we stopped discussing the case.

THE COURT: Do you think that your own ability to discuss the case fairly, decide the case based fairly on the evidence, has been affected by what has happened in the jury room?

JUROR: With 11 of us, yes; but another juror—

THE COURT: When you say "yes," you mean you can still do that or you cannot still do that?

JUROR: With 11 of us, we can. With the other juror, we've been over it for the past two days with this other juror. No matter what we say, it's not going to sway the other person's mind because of the way the person is thinking.

THE COURT. All right. Thank you.

(*Id.* 8:39–40.)

The last two jurors interviewed both identified the same purportedly biased statement. (*Id.* 8:40–42.) Both stated that it would not interfere with their ability to be fair jurors, deliberate, and reach a verdict based on the evidence. (*Id.*)

After a short recess, the court concluded that there was no bias or prejudice affecting deliberations, but rather that an impasse existed. (*Id.* 8:43.) The prosecutor requested that the court instruct the jury to ignore the issues of sentencing or other prosecutions, but the court declined. (*Id.* 8:43–44.) The defendants moved for a mistrial, and argued that the statements made by the jurors reflected the two prior notes that had also reported deadlock. (*Id.* 8:44.) The court denied the motion. The court then gave the following instruction to the jury:

THE COURT: Ladies and gentlemen, obviously I have inquired of each of you and I have determined that this is not a situation in which it is appropriate nor would I want to interfere with your deliberations. I told you that as jurors your job is to reach a verdict based on the evidence and only the evidence presented in this case and in accordance with my instructions if it is possible to do so. As you know, any verdict must be unanimous.

Having said that, I will ask you to return to your jury room and continue as you may.

(*Id.* 8:46.) Following this, both defendants renewed their mistrial motions. (*Id.* 8:46.)

Later Thursday afternoon, the jury recessed after the court received a note from the jury requesting that they be allowed to leave and return the next day. (*Id.*) The judge also excused the juror whose wife had an important medical appointment on Friday. (*Id.* 8:47.)

On Friday morning, the court heard further argument on the defendants' mistrial motions. (*Id.* 9:3–10.) Clements' counsel argued that "the Court directed at least one juror, asked one juror whether that juror could put aside the viewpoints of the other jurors in his deliberations," and that the judge's instruction to reach a verdict had "imposed upon the jury an undue pressure for them, particularly on the minority, to succumb to the wishes of the majority." (*Id.* 9:7–8.) The motions for a mistrial were denied. An alternate juror was then selected to replace the excused juror. (*Id.* 9:13.) The jury was instructed, rather perfunctorily, that with the new juror, it was to begin its deliberations anew. (*Id.* 9:12.)

At some point another note was received from Juror No. 4, which reiterated his request to be excused because of the need to attend to his dental patients and schooling. (*Id.* 9:14.) Because the judge apparently believed the case would likely be resolved that day, by mistrial or otherwise, she proposed taking the issue up at the end of the day. (*Id.*) Clements's counsel argued that "after reviewing the note in which he indicates several times his displeasure with starting over again and several times he is indicating the pressure he is feeling is affecting him and based on what he said yesterday in that he has already made up his mind and nothing—it

was relatively nothing that could be said was going to change that mind . . ." and requested that Juror No. 4 be removed. (*Id.* 9:15.) The judge then inquired of Juror No. 4:

JUROR: I'm sorry for being—it's—

THE COURT: No. Don't apologize. This—well, what I would like to say to you is that I am perfectly willing to take this up at the end of the day if—

JUROR: At the end of the day?

THE COURT:—the case has not resolved itself.

JUROR: Okay. That's—

THE COURT: No. But let me just—I need to ask you—

JUROR: No, it's not going to change the way I am doing anything.

THE COURT: Can you keep an open mind and deliberate today without being—your ability to do so—

JUROR: It's not going to change the way I feel. You've got to understand, your Honor, again, I wrote in my letter that when we first had this case you basically said it was going to be over on Tuesday. At that time, it was not an issue.

THE COURT: All right.

THE JUROR: If I knew this was going to—now this is going to go into our third week? I have an exam next week. I have rotations. It is very, very difficult.

THE COURT: All right.

JUROR: But it's not going to change the way I feel. I said that from the beginning. I'm a fair and impartial juror, always. And it's just that it's really reached a point—and today I have already cancelled my patients, obviously. But, if we go into next week, I mean, I'm really going to be—again, it's not going to change, but it's—I need to

graduate. It's going to be affecting me big time. And I don't mean to be—I know you spent a long, hard time doing this. I don't mean to be a pain in the tush, but that's just the way—you know, it's just very hard on me. You wouldn't believe how I yelled at a patient yesterday because I just—

THE COURT: Okay. Why don't we just leave it that we will take it up at the end of the day.

JUROR: That's fine. I don't have a problem with that.

(*Id.* 9:17–19.) Juror No. 4 returned and the jury resumed its deliberations. (*Id.* 9:19.)

At 4:00 p.m. on Friday afternoon, the jury returned a verdict. (*Id.* 9:20.) The jury found that Clements was guilty of murder in the second degree by reason of joint venture, of armed assault with intent to murder as a principal, and of possession of a firearm without a license. (*Id.* 9:20–21.) Mattox was found not guilty as to all three counts. (*Id.* 9:21–22.)

### D. Conclusions Regarding Coercion

While maintaining there was no constitutional error, the respondent also argues that even if there was, the error was harmless under *Brecht*, 507 U.S. at 637–38, 113 S.Ct. 1710. If there was a constitutional error of the trial type, the question under *Brecht* is whether it had " 'a substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239). This standard applies even where, as here, the state courts did not recognize the constitutional error nor review it under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007).

■ There is, of course, no way to know the exact substance of the jury deliberations, but the totality of the circumstances here strongly suggests that the verdict was substantially influenced adversely to Clements by the judge's interactions with the jury. The judge's voir dire questioning of the individual jurors and her subsequent instruction to the whole jury implicitly supported the evident tendency of at least some jurors in the majority to believe that they should focus on their own views of the evidence and not pay attention to the lone holdout.

It became clear to the judge early in the interview process, and it was confirmed as the interviews proceeded, that the problem concerning the jurors in the majority was not "bias" but rather the fact that one juror was obstinately refusing to agree with them. The judge had been put in an awkward position by the jury's wholly inapt characterization of the statement as "biased." That characterization led the judge to begin the interview process, in accordance with Massachusetts law. Having started the process, the judge found it difficult to terminate it.

However, the judge continued to conduct the inquiry as if potential "bias" was the problem well after it was abundantly clear that bias was not the problem. The line of questioning pursued by the judge did not fit the situation as it evolved. In fact, the judge's persistence in asking some jurors whether they could deliberate without being affected by the troublesome statement carried the very substantial danger of giving the court's sanction to the majority's own obstinacy.

Several jurors explicitly interpreted the holdout's expressions as pertaining to the credibility of Willis. His credibility was of obvious importance, since he was the only source of identification of either defendant

in the case. It is true that the holdout juror's statement voiced both a concern that was within the proper scope of deliberations (Willis's credibility) and one that was not (that the defendants should not be punished if Willis would not be), and for the judge to have instructed the jury to disregard the latter would not have been problematic. But the judge's questions and subsequent instruction did not parse the holdout's reported statement in this way, and the suggestion that the holdout's statement should not affect the deliberations of the other jurors went too far. It suggested that a juror's doubts about Willis's credibility could be ignored.

The coercive tendency of the judge's intervention was exacerbated by the context. The jury had informed the judge that they were at an impasse in notes on Tuesday and Wednesday. The *Tuey–Rodriquez* charge had been given on Wednesday. On Thursday morning, Juror No. 4 informed the judge on Thursday that jury deliberations did not "seem to be going anywhere," and that they were at "a big impasse." (*Id.* 8:9–10.) When the jurors were individually questioned later that day, they each reported, in varying degrees, that there was one holdout juror with whom the others disagreed. On Friday, when Juror No. 4 expressed his displeasure on with starting over and concern that the deliberations would continue into the next week, it was the fifth occasion on which the judge had been formally or informally informed of the deadlock by one or all of the jurors. On each occasion the judge instructed the jury or juror to continue deliberating. In light of what they could reasonably have understood as the judge's firm refusal to terminate the deliberations, the jury may very well have believed that they would not be discharged from their duties without reaching a unanimous verdict. *See United States v. Manning,* 79 F.3d 212, 223 (1st Cir.1996) (stating that the trial judge's response to a jury question "not only failed to discourage the notion that the jury was bound to continue to deliberate indefinitely, it suggested the opposite, *i.e.,* that a jury is required to do so .... [A] rational lay jury could reasonably have inferred that the court wanted it to reach a verdict, regardless of whether it could do so in good conscience.").

Indeed, the judge instructed the jury on Thursday afternoon, after the voir dire process had been completed, that "as jurors your job is to reach a verdict based on the evidence and only the evidence presented in this case and in accordance with my instructions if it is possible to do so. As you know, any verdict must be unanimous. Having said that, I will ask you to return to your jury room and continue as you may." This instruction had the same coercive tendency as the remarks of the judges in *Jenkins* and *U.S. Gypsum.* In light of the judge's previous refusal to accept the jury protestations of deadlock, the instruction tended to convey the idea that the jury was bound to render a verdict.

The pressure to reach a verdict was undoubtedly compounded by the impending weekend and the instruction, given the seating of an alternate, to begin deliberations anew. Moreover, Juror No. 4 was told Friday morning that his desire to be excused from deliberations would be addressed at the end of the day, very likely implying to him at least the possibility, if not the probability, that he would be excused. Because on Friday the other jurors were aware that when an alternate juror was seated because of the excuse of a deliberating juror, the entire jury must begin their deliberations anew, they would have realized that if Juror No. 4 were excused on Friday afternoon, come Monday morning they would be instructed to begin deliberations anew for a second

time. Similarly, but to opposite effect, Juror No. 4 also would have been aware of the possibility that he might not be excused and would himself have to return the next week. In this circumstance, the holdout would have continued to be the target of his already obvious frustration at her dissent from the majority position.

The respondent argues in his supplemental memorandum that any defect in the deliberations by reason of the court's voir dire and instructions was neutralized by the judge's instruction to begin deliberations anew on Friday morning when the replacement juror was seated. Ordinarily, jurors are presumed to follow the instructions given, but the circumstances here provide strong reasons to suspect otherwise. Ten of the original jurors opposed the holdout, including Juror No. 4, the most vocal and most annoyed of the group. The alternate had, by Friday, also been waiting around for four days, and could easily have felt pressure from the majority to wrap things up. In other words, both the original deliberating jurors and the newly seated alternate could have perceived that the judge would continue to refuse to terminate the deliberations and thus, it could have appeared, insist (as in *Jenkins*) on a verdict.

In summary, by Thursday, the fourth day of deliberations, the jury had several times indicated to the judge an inability to agree on a verdict. Although the judge began the individual voir dire of the jurors on Thursday out of a legitimate concern about a report of improper bias affecting deliberations, it became clear very early in the voir dire process that bias was not a problem but rather that majority jurors were upset with the refusal of the holdout juror to acquiesce to their views. The judge nonetheless persisted in the bias inquiry, notwithstanding her own apparent conclusion that bias was not an issue. In the course of interviewing jurors, some of the judge's questions—can you deliberate without regard to the statement you think was biased?—implicitly encouraged the complaining majority jurors to disregard the dissenting juror's statements. After the voir dire was completed on Thursday, the jurors were instructed to continue deliberating, with some implied suggestion that it was necessary for them to reach a verdict. On Friday a new juror was seated and the jury was told to start all over again. At least one juror (Juror No. 4) expressed the pressure he felt to conclude the matter. At the end of the day on Friday, faced with the prospect of returning the following Monday for further, possibly fruitless, deliberations, the jury returned its unanimous verdict.

Under all the circumstances, *see Jenkins*, 380 U.S. at 446, 85 S.Ct. 1059, the judge's apparent insistence that the jury should reach a verdict despite repeated reports of jury impasse, coupled with the unfortunate suggestion conveyed by the voir dire questioning that the holdout's views were less important than the other jurors' opinions, amounted to coercive pressure that very likely had a "substantial injurious effect or influence in determining the jury's verdict" of conviction. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710; *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239. The coercive pressure deprived Clements of a fair trial by an impartial jury, as guaranteed by the Sixth Amendment. The verdict, thus tainted by constitutional error, must be set aside.

## *IV. Conclusion*

For the reasons set forth herein, the petition for a writ of habeas corpus is GRANTED. The petitioner is to be released from custody unless the Commonwealth moves to retry him within sixty days from the entry of judgment, or such

other time as may be set by order of this Court or other court of competent jurisdiction.

It is SO ORDERED.