## COMMONWEALTH *VS.* RAFAEL GONZALEZ.

No. 89-P-130

Suffolk. October 6, 1989.—November 6, 1989.

Present: SMITH, CUTTER, & FINE, JJ.

*Jury and Jurors. Judge. Practice, Criminal*, Mistrial, Interrogation of jurors, Deliberation of jury.

Where, during prolonged deliberations of the jury at a criminal trial, a series of events leading to the judge's replacement of one juror created a serious risk that the unreplaced jurors would regard the judge's action as an endorsement and approval of their views on a vital issue in the case, the risk should have been obviated by a mistrial. [14-15]

INDICTMENTS found and returned in the Superior Court Department on November 4, 1982.

The cases were tried before *Sandra L. Hamlin*, J., and a motion for a new trial, filed on September 17, 1986, was heard by her.

*John F. Donovan* for the defendant.

*David B. Mark*, Assistant District Attorney, for the Commonwealth.

CUTTER, J. The defendant, Gonzalez, was indicted for murder in the first degree and for unlawfully carrying a weapon. He was found guilty on February 26, 1985, of murder in the second degree and of the weapon charge, after trial before a Superior Court judge and a jury. He was sentenced on February 27 and March 6, 1985. An appeal from these convictions was dismissed by this court for lack of prosecution.

A motion, pursuant to Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979), for a new trial was filed on September 17, 1986, in behalf of Gonzalez. The motion was denied, with extended findings and rulings, by the trial judge on May 20, 1988.

The record contains ample evidence, if believed, to warrant the jury in returning, on February 26, 1985, a verdict of guilty of murder in the second degree. We consider, however, only the principal question presented by the motion for a new trial, viz., whether the trial judge committed reversible error in replacing one juror, after a long trial and prolonged deliberations, in the circumstances described below.

On February 21, 1985, the jury began its deliberations. During the first four days of deliberations, the jury requested further instructions on the law of self-defense and on the elements of murder and manslaughter. The trial judge found that the "jurors appeared increasingly agitated, anxious, and fearful each time they reentered the courtroom for reinstruction causing the [judge] concern that something beyond the ordinary deliberations was occurring."

On February 24, 1985, the jury informed the judge that they were in a deadlock with regard to a single issue on one defendant (there were then two defendants) and could not continue deliberations until this deadlock was resolved. Unable to respond to that somewhat ambiguous communication, the judge, without objection from the prosecutor and defense counsel, instructed the jury "to articulate clearly and concisely what the problem is." She continued with an unusual statement that "any problem or any communication that any juror has for the court, any one of you, can be written down and sent to the court." The form of this statement unduly disregarded the usual channel of communication with the jury (through the foreperson) and unnecessarily invited individual jurors to submit matters to the judge. Later that day, the judge received an envelope containing a note from each of eleven jurors expressing concern about one juror, hereafter referred to as Juror X, and indicating that the signers, in varying respects, found Juror X at least uncooperative and difficult.

A twelfth note, written by Juror X, stated that he was aware that he was the juror about whom the others were concerned. His note also indicated that, unlike the rest of the jurors, he did not believe that the Commonwealth had met

its burden of proof beyond a reasonable doubt about the defendant's guilt of murder and thought the defendant to be guilty only of manslaughter.

Based on these notes and her observations of the conduct of Juror X and the other jurors during periods of reinstruction,[1] the judge became concerned about the situation and for the safety of the eleven jurors and wisely ordered a recess in jury deliberations which then had continued into a Sunday afternoon.

The judge, at some time prior to the opening of court on Monday, February 25, 1985 (in the absence of the then defendant, the prosecutor, defense counsel, and the jury), consulted various individuals who had some knowledge of Juror X's past behavior. These included a Superior Court judge, a District Court judge, and Juror X's former attorney. At least some of the persons consulted expressed to her the view that Juror X suffered from a mental problem. The judge also obtained for review the file of a then still pending civil case in which Juror X had been accused of vandalizing a neighbor's property. At two lobby conferences on the 25th, she informed counsel of the general nature of her investigations.

After the first lobby conference she told the jury she could not respond to their notes until they "had deliberated on all of the indictments with a view to arriving at a verdict on each." She directed them to continue their deliberations. At the second conference, after further discussion, the judge then decided, when referred to *Commonwealth v. Robichaud*, 358 Mass. 300, 302-303 (1970),[2] to hold a hearing concerning the conduct of Juror X, with this defendant

---

[1]It later appeared in a report dated February 25, 1985, of the director of the court psychiatric clinic who testified at the hearing on that day, that Juror X had admitted to him (the psychiatrist) that he (Juror X) had assembled and "dry fired" the homicide weapon while in the jury room. That report was filed on March 5, 1985, and was before the trial judge during the hearing on the motion for a new trial.

[2]The *Robichaud* case decided essentially that a defendant is entitled to be present at every significant stage of his trial for a felony. Juror X, of course, was not present at the hearing while jury deliberations continued.

(and a then codefendant) present. While the jury delibera-
tions still were going on such a hearing was then undertaken.

At the hearing, a police officer testified that Juror X had
been brought before a District Court numerous times on ille-
gal dumping and board of health charges. A representative
of the State Board of Probation confirmed the police officer's
testimony, and stated that Juror X had appeared nine times
in District Courts on charges ranging from assault and bat-
tery with a dangerous weapon to building code violations. It
appeared, however, that all these proceedings had been dis-
posed of in a manner which resulted in their dismissal or dis-
continuance without leaving Juror X with any criminal
record.

Based on what had then taken place, and the possibility
that Juror X might be mentally ill, the judge suspended jury
deliberations and called Juror X into the courtroom for ques-
tioning. She did not inform Juror X, at the outset of his testi-
mony, of the purpose of the inquiry to be made of him. See
*Commonwealth* v. *Connor*, 392 Mass. 838, 845 (1984). The
questioning principally dealt with responses which Juror X
had given on his jury questionnaire regarding his employ-
ment with an intelligence agency, his probation record, and
his involvement as a party in a civil action.

After observing Juror X and listening to his testimony, the
court psychiatrist testified before the judge that he would
characterize Juror X as a paranoid delusional who "could be
a danger and not responsible for his behavior." The psychia-
trist declined to testify without a further examination of Ju-
ror X whether the latter would be able to perform his duties
as a juror. Juror X and the psychiatrist then left the court-
room for an interview with each other.[3]

The judge then concluded (without further testimony from
the psychiatrist) that Juror X was unable to perform his duty
as a. juror for good cause which was personal to him. She
removed Juror X from the jury and replaced him with an-

---

[3]This presumably resulted in the report, dated February 25, 1985 (note
1, *supra*), filed in court on March 5, 1985.

other juror over the objection of defense counsel who asked for and was denied a mistrial.

We recognize fully that the trial judge was making a sincere effort in good faith to comply with all the requirements of the case of *Commonwealth* v. *Connor*, 392 Mass. at 842-847, and earlier cases such as *Commonwealth* v. *Haywood*, 377 Mass. 755, 765-770 (1979). She clearly had those requirements in mind and her memorandum of findings and rulings on the motion for a new trial reveals her attempt to deal with inherently difficult issues arising on a Sunday afternoon in a manner (a) fair to the defendant, (b) protecting eleven jurors from any risk of harm from Juror X, and (c) avoiding waste of at least fifteen days of effort by a Superior Court judge and sixteen jurors. As Chief Justice Hennessey pointed out in the *Connor* case (at 843), "The discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error. It is to be done only in special circumstances, and with special precautions."

We conclude that, in the present case, the aggregate effect of the actions of the trial judge, in what defense counsel at the hearing on the motion for a new trial conceded was "a very difficult situation for the trial judge," should have led the judge to declare a mistrial in the course of proceedings. Her request to the jury to state "clearly and concisely what the problem is" although made without objection by the prosecutor and defense counsel, resulted in an unfortunate disclosure to the judge of a definite split among the jurors as to their respective positions on a vital issue in the case. The subsequent course of the judge's investigations, although done discreetly, caused information to reach the judge which had not been subjected to cross-examination by any counsel and without the presence of the defendant.

The members (not replaced) of the jury knew that the trial judge had read their notes. The next thing they knew was that Juror X had been discharged "for personal reasons [which had] . . . nothing to do with any views he may have had on the case." The sequence of events was such as to create a serious risk that at least the unreplaced jurors would

regard the action of the judge as an endorsement and approval of their views (in preference to those of Juror X) despite the instructions of the judge just mentioned. It created appreciable danger of being regarded as reflecting an improper invasion of the province of the jury not within the purpose of the first par. of G. L. c. 234, § 26B, as amended through St. 1979, c. 344, § 9A.

The total effect of what took place, we think, brings the present case within the principles stated in *Commonwealth* v. *Webster*, 391 Mass. 271, 275-278 (1984), where there was "a strong likelihood that the jury . . . [might] have given special weight to [what the jury inappropriately may have regarded as] the judge's silent communication" of her views. See *Commonwealth* v. *Sylvester*, 388 Mass. 749, 751 (1983). The risk should have been obviated by a mistrial.

We reverse the judgments, set aside the verdicts, and remand the cases against this defendant for a new trial.

*So ordered.*