# United States Court of Appeals
## For the First Circuit

No. 09-1629

JASON CLEMENTS,

Petitioner, Appellee,

v.

HAROLD W. CLARKE,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Torruella, Selya and Howard,
Circuit Judges.

Randall B. Ravitz, Assistant Attorney General, Criminal Bureau, with whom Martha Coakley, Attorney General, was on brief, for appellant.
Rosemary Curran Scapicchio for appellee.

January 20, 2010

**HOWARD**, **Circuit Judge**.  This habeas petition is before us for a second time.  In 1995, a Massachusetts Superior Court jury convicted Jason Clements of second-degree murder, resulting in his receiving a life sentence.  After unsuccessfully appealing his conviction, Clements petitioned for a writ of habeas corpus in the District of Massachusetts pursuant to 28 U.S.C. § 2254.  When this case first reached us, we clarified which issues had been exhausted and were therefore appropriate for collateral review.  See Clements v. Maloney, 485 F.3d 158 (1st Cir. 2007) (Clements IV).  On remand, the district court granted the petition, concluding that the state trial judge had impermissibly, though unintentionally, coerced a guilty verdict as a result of a series of voir dire examinations of individual deliberating jurors.  See Clements v. Clarke, 635 F. Supp. 2d 26 (D. Mass. 2009) (Clements V).

The Commonwealth now appeals.  We conclude that the district court employed an insufficiently deferential standard of review and that the state-court conviction should stand.

## I. Facts

The details of both the crime and the petitioner's state trial have already been laid out in the numerous other reported decisions that his post-conviction challenges have produced.  See Clements IV; Clements v. Maloney, 359 F. Supp. 2d 2 (D. Mass. 2005) (Clements III); Commonwealth v. Clements, 763 N.E.2d 55 (Mass.

-2-

2002)(Clements II); Commonwealth v. Clements, 747 N.E.2d 682 (Mass. App. Ct. 2001) (Clements I).  A similarly well-developed record of the chronology of the jury's deliberations, from which the central issue in this appeal arises, can be found in the district court's most recent opinion.  See Clements V.  We synthesize only the key facts of the crime here, but necessarily will describe in more detail the events surrounding the jury's deliberations.  Any state court factual findings are presumed to be correct.  O'Laughlin v. O'Brien, 568 F.3d 287, 290 (1st Cir. 2009); 28 U.S.C. § 2254(e)(1). This deference extends to findings by all state tribunals, whether trial or appellate.  Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002).  Where necessary, we also supplement the state courts' factual findings with other portions of the record that are consistent with them.  O'Laughlin, 568 F.3d at 290.

On January 30, 1995, Gregory Tillery was shot to death in Dorchester, Massachusetts.  Having identified the petitioner and Kenneth Mattox as the culprits, the authorities charged them with second-degree murder by joint venture, armed assault with intent to murder, and unlicensed possession of a firearm.  Appearing before the grand jury, Sakoya Willis, an eyewitness, affirmatively identified Clements as the killer.  Willis had been selling drugs with the victim on a street corner when they were confronted by the defendants, and Willis was standing next to Tillery when the shooting began.  At trial, however, Willis recanted his

-3-

identification of Clements, insisting that he had not truly seen the shooter. The Commonwealth impeached Willis' testimony with his prior inconsistent statements, which included an identification from a photo array and a recorded statement to the police, in addition to his grand jury testimony. The remainder of the prosecution's case was based on circumstantial evidence.

The jury began deliberating on the afternoon of Monday, January 26, 1998, continuing for an hour before the court adjourned for the day. The jury reconvened on Tuesday morning and, after requesting Willis' trial testimony and inquiring into the theory of joint venture, continued to deliberate until mid-afternoon. At that point, the judge received a note from the jury indicating that it was deadlocked. The judge returned the note and instructed the jury to continue deliberating, which it did for the remainder of the day.

On Wednesday, the jury once again notified the judge that it was deadlocked. The judge issued the standard instructions given in Massachusetts courts when jurors have been unable to agree, known as a "Tuey-Rodriguez charge." See Commonwealth v. Rodriquez, 300 N.E.2d 192, 202-03 (Mass. 1973); Commonwealth v. Tuey, 8 Cush. 1, 2-3 (Mass. 1851). Following this instruction from the court, the jury resumed deliberating, but finished early for the day with the court's permission.

On Thursday morning, the judge received two more notes, each from a different juror.  The first stated that the juror's wife had an important medical appointment the following day.  The second, from Juror No. 4, said that "[o]ne person is not competent enough to be on this jury."  The judge decided to interview Juror No. 4, a full-time dental student who had previously expressed reservations about the trial schedule.  During the interview, Juror No. 4 began referring to a "big impasse," but the judge immediately told him not to disclose anything further concerning deliberations.  Following this, the entire jury was again instructed to resume deliberations.

Then, on Thursday afternoon, the judge received a third note, which quickly precipitated the chain of events giving rise to this appeal.  This note succinctly stated, "Upon further investigating, a statement made by one of the jurors is biased; and we would like to speak to the Judge concerning this extreme."  The note bore the signature of Juror No. 9, with the addendum "Foreman refused to sign it."  After considering the note, the judge resolved to conduct an individual voir dire of each juror in order to determine whether any evidence of bias existed and what impact, if any, the alleged bias might be having on the deliberations.

The judge asked the first juror interviewed whether there was anything said that she might consider to be a biased statement. The juror responded, "[O]ne of the jurors say . . . I feel that if

they go to jail then he ought to go to jail, too, talking about one of the witnesses. So we assumed -- take that as a biased statement." Asked to clarify, the interviewee went on to explain that the juror in question had said, "[W]hy should I put two innocent guys in jail when I believe the witness should be in jail himself. So she assume -- you know, she figure that all of them should be in jail or they should be set free because she doesn't believe this witness."

After the interview concluded, all agreed that the reported statement did not seem to involve any bias. The judge agreed with Mattox's attorney that what amounted to one juror's concerns over testimony was no reason to intervene. Nevertheless, the judge observed that they had only "heard from one juror," and that she "wasn't exactly clear that you can take that as a necessary statement." The court therefore decided to inquire of at least one other juror in order to confirm the first interviewee's version of events.

The next juror interviewed was No. 4, the dental student who had previously expressed reservations about the length of the deliberations. At the time, the judge actually suspected that Juror No. 4 was the source of the allegedly biased statement. Shortly after beginning the interview, the court realized that this suspicion was incorrect. Juror No. 4 said that he was "[o]ne hundred percent positive" that he had heard something indicating

-6-

bias or prejudice on the part of another juror. The colloquy continued:

> JUROR: We were discussing the reason we were at an impasse. And the juror -- do you want me to give a name -- the juror who was one of the people who was in the -- against the majority of the rest of the people basically said that she could not basically believe Sakoya Willis' testimony because of the fact that she believes he should go to jail and she cannot convict two defendants on that, basically, because Sakoya Willis has no punishment towards him. So, basically, she believes that the witness is not credible for that reason.
> THE COURT: So explain to me what you see as the bias.
> JUROR: Basically, she would not convict the two defendants because she believes Sakoya Willis deserves to go to jail, as well. And that was clean out, simple as can be, stated to all of us; and all of us heard it.
> THE COURT: Do you think that this statement by her will interfere with your own ability to fairly deliberate on the evidence in the case?
> JUROR: My own ability?
> THE COURT: Yes.
> JUROR: No, not at all. It won't affect my ability. I think it affected her ability.
> THE COURT: All right. So you think, as far as you are concerned, you can continue to deliberate --
> JUROR: I have no problem. It has not changed my mind in the case. I believe that --
> THE COURT: Okay. Don't tell us what you believe. But you think you can fairly --
> JUROR: I have no problem continuing deliberating in this case.
> THE COURT: All right. Thank you.

After this exchange concluded, counsel for each defendant moved for a mistrial, arguing that the jury had reached an impasse. The judge considered the motions during a recess, but ultimately

-7-

decided that, having started the voir dire process, it would be appropriate to complete it. Each defendant's attorney objected on the record.

Subsequent interviews revealed more of the same. Juror No. 5 stated that the juror in question had "said something to the effect that I can't put two young men in jail when I think the person who is giving the testimony should be in jail, also." As before, the judge followed by asking if "having heard that statement is going to interfere with your own personal ability to deliberate on this case and consider fairly the evidence." Again, the juror reassured the judge that it would not. After this juror left, Clements's attorney renewed his objection, arguing that the judge's question was effectively "acting and directing this juror to put aside statements made by another juror in reference to the credibility for a particular witness. And, respectfully, I believe it's unduly influencing this juror." The court noted the objection, but decided to press on.

After interviewing another juror who also corroborated the now familiar narrative, the court addressed Juror No. 7, the foreperson -- who was also revealed to be the holdout. The judge asked whether she had heard any statement from another juror that she thought to be biased or prejudiced. Juror No. 7 responded, "No, your Honor. I haven't. And I am the only juror that is not -- I have ruled not guilty." The judge interjected, "I really

don't want to hear about your deliberations." The court then reconfirmed with the juror that no biased or prejudiced statements had in fact been made and ended the interview.

The next juror interviewed had written down what she claimed was a direct quote of the statement, which read: "I don't find Sakoya to be a credible witness. How can I put two young men in jail when he, Sakoya, probably should be in jail, himself." The judge acknowledged that "you might not agree with particular jurors," then asked whether her "own ability to deliberate and focus [her] deliberation only on the evidence" was affected. The juror, as the others before her had, affirmed that she could continue to deliberate.

Interviewed next was juror No. 9, who had signed the note. Unlike her peers, who, when asked, all confirmed that they would still be able to reach a fair and impartial verdict, this juror indicated that her ability to do so had actually been compromised. The judge asked her why, to which she responded that "you know, she's not looking at evidence. The person is not looking at evidence. They are putting a statement in that shouldn't be there that's keeping us -- " At this point, the judge cut her off, thanked her, and moved on to the next juror.

The court continued this process in similar fashion through the entire jury. Each time, the judge asked if the juror had heard a statement evincing bias or prejudice, and each time the

interviewed juror said yes and identified the holdout's comments. The court asked each juror whether the juror's own ability to deliver a fair and impartial verdict was compromised. Most said that it wasn't. Four, including the note's author, seemed to indicate otherwise, but it became clear from subsequent inquiry that each of them had misunderstood the judge's question.[1] They were describing the holdout juror, not themselves, when they referred to impartiality. At worst, they were describing an inability to reach a verdict as a unanimous jury.[2]

Following voir dire of each of the jurors, the court addressed counsel as follows:

---

[1]In addition, a fifth juror expressed similar sentiments, but he was subsequently discharged and replaced with an alternate due to a personal matter, after which deliberations recommenced.

[2]For example:
> THE COURT: Okay. Do you feel that that statement by the juror is going to interfere with your ability to decide this case fairly on the evidence?
> JUROR: I do, 'cause for the last four days it's been the same one person that none of us can reach. And, when she made the statement, that led us to believe this is what she's been thinking all the time.
> . . .
> THE COURT: Okay. And, if I understand -- well, you say that you think it's going to interfere with your ability because–
> JUROR: Yeah, because for the last four days this certain person been the hold-up. We only discussed one person. We haven't been able to move forward to the second person.
> THE COURT: Okay.

-10-

It seems to me that what we heard from the various jurors is that there is an impasse. But nothing that I heard indicated a type of bias or prejudice that I think would warrant myself interfering with or stopping the deliberations of the jury. And so I think in the circumstances, what I would tell the jurors is that having made the inquiry, this is not a situation where I think I would be warranted in interfering with their deliberations and that they should continue to deliberate. They know that they -- my instructions have indicated before they are to consider whether they are to reach a unanimous verdict on each of the verdicts, if that is possible, and that is what they are to do. But I don't think that it's a situation that suggests either the removal of any juror for bias or prejudice or really any further step. I think what we heard was really a reflection of the nature of the deliberations, which is really up to the jury and not to me.

Each defendant's counsel renewed his motion for a mistrial, which the court noted but denied. Finally, that afternoon, the judge explained to the full jury that "this is not a situation in which it is appropriate nor would I want to interfere with your deliberations. I told you that as jurors your job is to reach a verdict based on the evidence and only the evidence presented in this case and in accordance with my instructions if it is possible to do so." With the voir dire behind them, the jurors were sent out to resume deliberations. It requested and was granted permission to end early and reconvene the following morning.

On Friday, defense counsel once again renewed their motions for mistrial. Clements's counsel maintained that the court

-11-

had effectively asked at least one juror to "put aside the viewpoints of the other jurors in his deliberations." Furthermore, he argued, the court had "imposed undue pressure" on the minority "to succumb to the wishes of the majority." Once again, the motions were denied.

At some point that morning, Juror No. 4 contacted the judge to remind her of the toll that the lengthy deliberations were taking on his dental studies. The judge suggested leaving the issue until the end of the day. During their conversation, the juror stated, "[I]f we go into next week, I mean, I'm really going to be -- again, it's not going to change but it's -- I need to graduate. It's going to be affecting me big time. And I don't mean to be -- I know you spent a long, hard time doing this. I don't mean to be a pain in the tush, but that's just the way -- you know, it's just very hard on me." The judge cut off Juror No. 4 in the middle of his next sentence and said, "Why don't we just leave it that we will take it up at the end of the day." The juror agreed and returned to deliberate.

Late that afternoon, the jury reached its verdict. Clements was convicted of all three charges. He would eventually be sentenced to life imprisonment. Mattox, on the other hand, was acquitted.

Following his conviction, Clements appealed several separate alleged defects in his trial, most of which do not concern

us here.[3]  The only claim before us is that the jury was coerced, in violation of the Sixth Amendment, by the court's voir dire of individual jurors and its subsequent remarks to the jury.

## II. Discussion

### A. Statutory Framework

Our review of the district court's ruling is de novo. Yeboah-Sefah v. Ficco, 556 F.3d 53, 65 (1st Cir. 2009). Accordingly, "the district court opinion, while helpful for its reasoning, is entitled to no deference." Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006).

Before turning to the merits of the petitioner's claim, we must first determine the proper standard of review with which to approach the state court's disposition of the petitioner's direct appeal.  The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides that on federal habeas review, the level of deference owed to a state court decision hinges on whether the state court ever adjudicated the relevant claim on the merits or not.  28 U.S.C. § 2254(d).  If so, the petition will not be granted unless the state court adjudication:

> (1) . . . resulted in a decision that was contrary to, or involved an unreasonable

---

[3]The provenance of the other claims is discussed in detail in Clements III, 359 F. Supp. 2d at 5.

-13-

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. In contrast, a state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA. When presented with such unadjudicated claims, the habeas court reviews them de novo. Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

The Supreme Judicial Court, Massachusetts' highest state court, declined to review the jury coercion issue. Commonwealth v. Clements, 752 N.E.2d 241 (Mass. 2001) (table). We therefore "look through to the last reasoned decision" in our attempt to deduce the basis for the state court's holding. Malone v. Clarke, 536 F.3d 54, 63 n.6 (1st Cir. 2008) (quotations omitted). Accordingly, we turn to the decision of the Massachusetts Appeals Court in Clements I.

## B. The State Court Decision

The Massachusetts Appeals Court addressed the jury coercion issue among a potpourri of "other claims" toward the end of its opinion. As to coercion, the court stated:

> Contrary to the defendant's contention, the trial judge did not invade the autonomy of the jurors' deliberations. After the judge received a note from the jury indicating that one of the jurors allegedly had made a biased statement, the judge properly conducted an individual voir dire with each juror. See Commonwealth v. Laguer, 410 Mass. 89, 97, 571

-14-

N.E.2d 371 (1991). After finding no bias, she ordered the jury to continue with their deliberations.

During the course of the voir dire, the judge learned that eleven jurors favored conviction while one juror favored acquittal. The defendant argues that the judge's directive to the jury to continue deliberations may have been interpreted by the jury as an implicit endorsement of the majority position over the one juror who favored acquittal. See Commonwealth v. Gonzalez, 28 Mass. App. Ct. 10, 14-15, 545 N.E.2d 862 (1989).

The record shows no impropriety by the judge. The transcript indicates that she was not coercive, did not attempt to influence their judgment, and in no way intimated to the jurors that she agreed or disagreed with their positions. She merely informed the jurors that she had found no evidence of juror bias and that they should continue to deliberate.

Clements I, 747 N.E.2d at 694.

Clements urges us to conclude, as did the district court, that this cursory treatment did not constitute an adjudication on the merits of his federal claim. We disagree.

A matter is "adjudicated on the merits" if there is a "decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007). Here, there is no dispute that the Massachusetts Appeals Court's treatment of the jury coercion claim constituted a final decision with res judicata effect. Moreover, the court rested its decision on undoubtedly substantive

-15-

grounds, holding that it had found in the record no evidence of coercion or exertion of influence. Thus, this was neither a disposition on procedural grounds nor a summary disposition in which the court simply remained silent on the issue. Cf. Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (reviewing state court opinion that, although addressing evidentiary challenges, "did not mention Norde's Sixth Amendment claims" and "does not contain any language, general or specific, indicating that those claims were considered and denied on the merits").

Nevertheless, even if it is uncontested that the state court's grounds were substantive, determining precisely which substance proves a bit more elusive. The state court did not expressly identify the right that was actually at stake. It merely held that no "impropriety" had occurred and proceeded to offer its conclusions regarding the lack of coercion. The problem that we face in reviewing the state court decision is that "impropriety," by itself, has neither a state nor a federal valence. It is, therefore, not immediately apparent whether the state court was disposing of Clements's federal constitutional claim, or whether it was only addressing the parallel claim that Clements had made under Art. XII of the Massachusetts Declaration of Rights.[4] Were we to

---

[4]The question presented to the Massachusetts Court of Appeals was: "Did the trial court's questions to deliberating jurors requesting that they disregard an opinion of the lone holdout that Clements was not guilty, invaded [sic] the province of the jury and violated [sic] Clements [sic] right to a fair trial pursuant to the

-16-

find that the state court had relied solely on state standards that did not implicate federal constitutional issues, we would review the matter de novo.  See DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001).

There is, however, an additional and, we think, critical data point that aids us in our inquiry.  In its discussion, the state court cited to a Massachusetts case, Commonwealth v. Laguer, 571 N.E.2d 371 (Mass. 1991).[5]  Clements contends that the reliance on state case law, unaccompanied by any direct mention of federal law, necessarily means that the federal claim remains unadjudicated.  That is, although the state court never expressly indicated that it was applying purely state law, the fact that the court cited solely to state precedent should be read to exclude any reliance on federal law.  On this basis, Clements argues, we should review his Sixth Amendment claims de novo.

---

Sixth and Fourteenth Amendments to the United States Constitution, as well as Article XII of the Massachusetts Declaration of Rights?"

[5]A second cited case, Commonwealth v. Gonzalez, 545 N.E.2d 862 (Mass. 1989), involved the potential for a jury to misinterpret a judge's directives as an implicit endorsement of a particular verdict.  The Gonzalez court held that a mistrial was warranted under state law when a trial judge discharged a juror for personal reasons following a deadlock, and that juror turned out to have been the lone holdout against conviction.  Here, neither party has made any argument regarding the legal import of the Massachusetts Appeals Court's citation to Gonzalez in Clements I.  In any case, we find no federal issue addressed in that case and, accordingly, confine our discussion to the Laguer citation briefed and argued by the parties.

We see no reason why such an inflexible rule as the appellant urges should be adopted.  "[I]t would elevate form over substance to impose some sort of requirement that busy state judges provide case citations to federal law . . . before federal courts will give deference to state court reasoning." Zuluaga v. Spencer, 585 F.3d 27, 31 (1st Cir. 2009).  The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue.

In DiBenedetto, we considered a Supreme Judicial Court opinion that had cited only Massachusetts judicial decisions and never addressed the federal constitutional issues that the defendant had raised on direct appeal. We reviewed those claims de novo, holding that AEDPA's deferential standard of review is inapplicable when the state court does not "decide constitutional claims raised by the defendant."  272 F.3d at 7.  We also noted, however, that reference to state court decisions that themselves deal with federal constitutional issues may be sufficient to trigger AEDPA's heightened deference.  Id. at 6; see also Washington v. Schriver, 255 F.3d 45, 61-62 (2d Cir. 2001) (Calabresi, J., concurring) (noting that even citation to "State court decisions that apply federal law" might qualify as "specifically addressing" a petitioner's constitutional claims). Here, a closer look at the Massachusetts Appeals Court opinion

persuades us that it did indeed address Clements's Sixth Amendment claims.

Laquer, which the court relied on, concerned an attempt to impeach a jury verdict on account of alleged ethnic bias in the deliberations.  The Supreme Judicial Court held that it would have been appropriate for the trial judge to conduct an evidentiary hearing in order to confirm or deny the reports of bias.  In justifying the hearing, which would have otherwise been disallowed under state law, the court explained that "[w]e are persuaded that the possibility raised by the affidavit that the defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored."  571 N.E.2d at 376.  It then quoted a passage from Irvin v. Dowd, 366 U.S. 717, 722 (1961), that "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  571 N.E.2d at 376.

Irvin itself dealt with prejudicial pretrial publicity. Because Irvin's underlying subject matter (pretrial publicity) is not the same as in this case (the trial court's allegedly coercive juror inquiries), Clements urges us to reject -- as did the district court -- the Commonwealth's argument that Laquer's citation to Irvin signals an adjucation on the merits of the federal claim.  See Clements V, 635 F. Supp. 2d at 33-34 (explaining that the question of whether extensive pretrial

-19-

publicity prevents a defendant from receiving a trial before an impartial jury has "nothing to do with judicial inquiry of deliberating jurors of the possibility of judicial pressure on an undecided jury to render a verdict").

We think that Irvin carries more weight in the state appellate court's analysis than the petitioner acknowledges. The Court in Irvin did not spin federal law out of whole cloth; it was interpreting the Sixth Amendment right to a fair and impartial jury, the very same constitutional provision on which Clements stakes his claim for relief. Indeed, the petitioner should appreciate Irvin's salience to the allegation of juror coercion, as he himself invoked Irvin when he presented his constitutional claims in a motion for a new trial.[6] See Def.'s Mem. in Supp. of Mot. for a New Trial at 22, Commonwealth v. Clements, No. 96-11434 (Mass. Super. Apr. 16, 1999) (citing Irvin for proposition that failure to grant a defendant a hearing before an impartial jury violates due process); Petr.'s Mem. of Law in Opp. to Respt.'s Mot. to Dismiss for Failure to Exhaust State Ct. Remedies at 12 (confirming that motion for new trial had "cited the right to an impartial jury under the Sixth and Fourteenth Amendments and cited

---

[6]It is true that the petitioner did not cite to Irvin for support before either the Massachusetts Appeals Court or the federal district court. But he did plainly rely on that case in his motion for a new trial before the superior court, the denial of which was subsequently consolidated with his direct appeal to the Massachusetts Appeals Court.

Irvin v. Dowd, supra, in advancing the claim that the trial judge improperly invaded the province of the jury and coerced a guilty verdict"). Clements's aboutface on this issue is understandable but ultimately unavailing. His citation to Irvin in his new trial motion reinforces our own view of that case's relevance to the constitutional question before us here.[7]

Even if the Massachusetts Appeals Court was unaware of Clements's invocation of Irvin in his new trial motion, our conclusion nevertheless remains the same. Laquer, according to the Massachusetts Appeals Court's reading, vindicates the trial judge's behavior in as much as it mandates investigation once the red flag of juror bias has been waved. The Laquer court remanded for the purpose of conducting an evidentiary hearing into potential bias because the constitutional right to an impartial jury not only should not be ignored, but "cannot be ignored." Laquer, 571 N.E.2d at 376 (emphasis added).

Thus the state appellate court's reason for pointing to Laquer is clear. The court cited Laquer (which, again, relied on

---

[7]The state appeals court docket indicates that it had consolidated Clements's appeal of the superior court's denial of his motion for new trial with the appeal from his conviction. In doing so, it ordered the Suffolk Superior Court clerk's office to forward all updated copies of the docket and any transcripts as they became available. See Docket Entry 3, Clements I, 747 N.E.2d 682(No. 1999-P-158), available at http://www.ma-appellatecourts. org/display_docket.php?dno=1999-P-0158. The motion for new trial itself and its accompanying memorandum of law likely would have been incorporated into the appeals court record as part of this consolidation.

-21-

<u>Irvin</u> for that case's explication of the Sixth Amendment right to an impartial jury) for the proposition that a judge faced with a claim of juror bias is compelled to inquire further. This reading accords with <u>Laguer</u>'s legacy in the courts of the Commonwealth. <u>See, e.g.</u>, <u>Commonwealth</u> v. <u>Mendes</u>, 806 N.E.2d 393, 409 (Mass. 2004) (summarizing <u>Laguer</u> by stating that "defendant's right to fair trial required further inquiry by judge"); <u>Commonwealth</u> v. <u>Cuffie</u>, 609 N.E.2d 437, 440 (Mass. 1993) (citing <u>Laguer</u> for proposition that "[t]he defendant was entitled to receive a trial by jury whose members are impartial").

It is true that <u>Laguer</u> would not have given a trial judge carte blanche to conduct the voir dire in any way she pleases, and perhaps this is why Clements insists that its relationship to his coercion claim is oblique at best. Even so, the fact that the appeals court made conclusory statements, such as "the record shows no impropriety" and "[t]he transcript indicates that she was not coercive," is not dispositive. Once the federal-rights backdrop is understood, the court's analysis was sufficient. AEDPA's trigger for deferential review is adjudication, not explanation. <u>Cf.</u> <u>Wright</u> v. <u>Sec'y for Dep't. of Corrections</u>, 278 F.3d 1245, 1255 (11th Cir. 2002) (holding that even summary dispositions constitute merits adjudications because "all that is required [by the statute] is a rejection of the claim on the merits, not an explanation"). When a state court has truly avoided (or merely overlooked) the

-22-

petitioner's federal claim, a federal court may step into the breach and review de novo. But judicial opacity is a far cry from judicial avoidance. It is the result to which we owe deference, not the opinion expounding it. See Teti, 507 F.3d at 56-57 (holding that AEDPA deference "applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision was reached; the adequacy of . . . the decision [is] addressed through the lens of § 2254(d), not as a threshold matter"); Rashad v. Walsh, 300 F.3d 27, 45 (1st Cir. 2002) ("It is not our function . . . to grade a state court opinion as if it were a law school examination.")

In sum, we conclude that the Massachusetts Appeals Court considered and adjudicated the petitioner's federal claim. Accordingly, § 2254(d) governs our review.

## C. The Jury Coercion Claim

With the appropriate standard of habeas review determined, we turn to the merits of the petitioner's claim. Clements contends that the judge's conduct was, however well-intentioned, a violation of his Sixth and Fourteenth Amendment rights to a trial by an impartial jury. Specifically, he argues that the colloquies during the series of voir dires effectively signaled to the jurors that they must reach a verdict and should ignore the remaining holdout, contravening the defendant's right to

an uncoerced jury verdict.  See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).

To merit the grant of habeas relief under § 2254(d), the state appeals court's determination of the voir dire issue must fail under either the "contrary to" or the "unreasonable application" prong of the statute.  A state court decision is "contrary to" clearly established Supreme Court law if it "contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent." John v. Russo, 561 F.3d 88, 96 (1st Cir. 2009) (internal quotations marks and brackets omitted); see also Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir. 2002) (elaborating on "contrary to" prong).  An unreasonable application, on the other hand, occurs if the court either "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case or unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Russo, 561 F.3d at 96 (internal quotation marks and brackets omitted); see also McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (elaborating on "unreasonable application" prong).

The threshold question is what constitutes "clearly established federal law, as determined by the Supreme Court of the United States." See Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Dagley v. Russo, 540 F.3d 8, 16 (1st Cir. 2008). In pressing his claim of jury coercion, Clements directs us to three cases decided by the Supreme Court: Jenkins v. United States, 380 U.S. 445 (1965), United States v. U.S. Gypsum Co., 438 U.S. 422 (1978), and Lowenfield. The first two of these cases, however, are of no assistance to him, as the Supreme Court has foreclosed our consideration of precisely these cases. In Early v. Packer, 537 U.S. 3, 10 (2003) (per curiam), the Court held that Jenkins and Gypsum Co. were based on the Court's supervisory power over the federal judiciary rather than on any constitutional provision applicable to state-court proceedings. See also Lowenfield, 484 U.S. at 239 n.2 (noting that Jenkins was based on the "supervisory power over the federal courts, and not on constitutional grounds"). We can ask for no clearer direction than the Court's injunction that "Jenkins and Gypsum Co. are off the table as far as § 2254(d) is concerned." Packer, 537 U.S. at 10.

That leaves us with Lowenfield. There, the Court held that a capital sentencing jury was not unconstitutionally coerced by a combination of the trial judge's polling and supplemental instruction. In denying the petitioner's claim based on the totality of circumstances, the Court noted that "we do not mean to

be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body."  484 U.S. at 241.  This language is scant precedent on which to hang this § 2254 claim.

To begin with, we note that the Court in <u>Lowenfield</u> <u>rejected</u> the claim that the judge's behavior was unconstitutional. The broadly worded passage quoted above, although unexceptional, is also primarily dicta, which by definition is not clearly established law. <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 412 (2000).  To the extent that <u>Lowenfield</u> does constitute clearly established federal law, that law can be summarized as follows: defendants have a right against coerced jury verdicts, and any potential coercion should be measured based on the totality of the circumstances. There is nothing to suggest that the Massachusetts Appeals Court in <u>Clements I</u> ran afoul of this standard in reviewing the trial judge's actions.  Because the Supreme Court has established so little in the way of a constitutional rule governing state courts' use of polling and voir dires during jury deliberations, there is equally little for a state court to contradict.

By the same token, the state court did not unreasonably apply <u>Lowenfield</u>.  As the Supreme Court has explained, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). We think Lowenfield's totality-of-the-circumstances test, to the extent that it constitutes clearly established federal law to begin with, allows for a great deal of leeway. The state appellate court in this case reviewed the relevant transcript, considered the judge's actions, and concluded that they were not improper. Regardless of whether or not we would have reached the same conclusion that the state court did, we cannot say that the state court's treatment of the jury coercion issue, though brief, was unreasonable. See Foxworth v. St. Amand, 570 F.3d 414, 429 (1st Cir. 2009) ("A sparsely reasoned state-court decision may set off warning bells, but such a decision does not necessarily mean that the outcome represents an unreasonable application of clearly established Federal law.").

## III. Conclusion

We reverse the district court's grant of relief and remand with instructions to reinstate the petitioner's conviction. **SO ORDERED**.

-**Concurring Opinion Follows -**

**TORRUELLA**, **Circuit Judge** **(Concurring).** I join the majority in holding that AEDPA's deferential standard of review controls in this case. 28 U.S.C. § 2254(d). I also agree with the majority that reversal of the district court's grant of relief in this case is proper. I write separately to clarify my view that the panel's decision should not be interpreted to endorse the position that a state court decision that fails to expressly identify the relevant federal claim should necessarily be considered an adjudication on the merits for AEDPA purposes.

Petitioner Jason Clements claims that his Sixth Amendment right to a fair trial was violated when the state trial court invaded the province of the jury and coerced a guilty verdict. The Massachusetts Appeals Court affirmed Petitioner's conviction and rejected his claim that the trial court judge coerced the jury into returning a guilty verdict when she conducted an individual voir dire of jurors to investigate a claim of juror bias. In its decision, however, the Appeals Court failed to specify whether it was considering Petitioner's Sixth Amendment claim, a similar claim under the Massachusetts Constitution, or both. Instead, the Appeals Court cited the Supreme Judicial Court of Massachusetts' decision in Commonwealth v. Laguer, where the Supreme Judicial Court relied on the right to "a fair trial by a panel of impartial 'indifferent' jurors," Irvin v. Dowd, 366 U.S. 717, 722 (1961), to hold that the convicted petitioner in that case was entitled to an

-28-

evidentiary hearing in which the court would evaluate evidence of potential juror bias.  571 N.E.2d 371 (Mass. 1991).

As the majority explains, the Appeals Court adjudicated petitioner's claims on substantive grounds when it concluded that the trial judge "was not coercive, did not attempt to influence [the jurors'] judgment, and in no way intimated to the jurors that she agreed or disagreed with their positions." Commonwealth v. Clements, 747 N.E.2d 682, 694 (Mass. App. Ct. 2001).  Thus, we are not faced in this case with a state court denial of a federal claim on procedural grounds.  Likewise, we are not dealing with a state court decision that summarily denied the claims without discussion.

Notwithstanding, the determination that the Appeals Court issued a decision on non-procedural grounds does not automatically trigger AEDPA's deferential standard of review.  The majority correctly identifies this distinction and engages in an analysis of the decision rendered by the Appeals Court in order to ensure that the state court addressed the federal claim on the merits.  In my view, however, the panel tests the limits of our precedent in this area when it accepts the proposition that summary adjudications by state courts may nevertheless merit AEDPA deference because, as the majority opinion claims, "AEDPA's trigger for deferential review is adjudication, not explanation."

When exercising review of a habeas petition, AEDPA requires federal courts to determine, as a threshold matter,

whether the state court adjudicated the federal claim on the merits. Only after this threshold determination is made, does AEDPA's deferential standard of review demand respect for state court judgments and require federal courts to assess the reasonableness of the state court's outcome, not its reasoning. DiBenedetto v. Hall, 272 F.3d 1, 6 (1st Cir. 2001) (holding that "when the state court has addressed the federal constitutional issue, it is its ultimate outcome, and not its rationalization, which is the focus"). But where the state court opinion fails to explicitly address the constitutional claim, no deference to the state court is warranted precisely because we have no basis to assess the reasonableness of the state court's holding. Thus, the threshold determination of whether the state court addressed the federal claim on the merits requires us to examine the state court's reasoning, not merely its outcome.

In my view, this panel's decision should not be read to merge the threshold determination of whether the state court addressed the federal claim on the merits with the scope of our review once it is determined that AEDPA deference is appropriate. These are two distinct inquiries that we must keep separate in assessing the scope of our review in federal habeas cases.

A review of the Appeals Court's decision in the context of Petitioner's jury coercion claim reveals that the court directly addressed Petitioner's "contention [that] the trial judge . . .

invade[d] the autonomy of the jurors' deliberations." <u>Clements</u>, 747 N.E.2d at 694. Although the Appeals Court did not expressly mention the relevant federal law, it relied on state court precedent that in turn discussed the Sixth Amendment right to a trial by an impartial jury. Additionally, the Appeals Court made no indication that it was making a decision on the sole basis of state law. Construing the Appeals Court's decision in the context of Petitioner's Sixth Amendment claim, I agree with the majority that the Appeals Court addressed Petitioner's federal claim on the merits. The language employed by the Appeals Court in analyzing Petitioner's claim and its reliance on a Massachusetts case that expressly expounded the guarantee to an impartial jury, provide a clear and reliable basis to conclude that there was an adjudication on the merits.

I must emphasize, however, that the panel's decision should not be interpreted as endorsing the view that recursive citations to state case-law necessarily provide a reliable basis to conclude that the state court addressed a federal claim on the merits. This court has explicitly declined to apply AEDPA review where the state court failed to address the federal claim. <u>Fortini</u> v. <u>Murphy</u>, 257 F.3d 39, 47 (1st Cir. 2001); <u>Brown</u> v. <u>Maloney</u>, 267 F.3d 36, 40 (1st Cir. 2001) (applying <u>de novo</u> review where the state court's decision failed to address the federal claim that was raised for the first time on rehearing and clarifying that <u>de novo</u>

review controlled given the absence of reasoning in the state court's decision).  Thus, in assessing whether a state court adjudicated a federal claim on the merits there should be a clear and articulable indication that the state court addressed the claim.  Although the language employed by the Appeals Court and its reliance on a state case that included an explicit reference to the Sixth Amendment right to a trial by an impartial jury is enough to conclude there was an adjudication on the merits in this case, I must caution that the panel's decision should not be read to adopt a steadfast rule that mere citation to state case law warrants the conclusion that an adjudication on the merits was made for AEDPA purposes.

In exercising habeas review we do not require state courts to employ particular language, or to include explicit citations to federal case-law in their decisions.  Coleman v. Thompson, 501 U.S. 722, 739 (1991)("We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim . . . .").  However, we should have a clear and articulable basis to conclude that the state court addressed the federal claim. The importance of this requirement is heightened by the fact that once AEDPA's deferential review is held to apply, we are required

to gauge the reasonableness of the outcome in the context of the federal law the state court applied to the facts of the case. See Williams v. Taylor, 529 U.S. 362, 413 (2000)(explaining that a state court decision amounts to an unreasonable application of clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case").

As a postscript, I must stress that although AEDPA's deferential standard of review discourages federal review of issues that were addressed by the state courts on the merits, AEDPA did not deprive state prisoners of their right to seek review in federal court of their constitutional claims. See Washington v. Schriver, 255 F.3d 45, 62 (2d Cir. 2001) (Calabresi, J. concurring) (discussing the legislative history and purposes behind AEDPA and 28 U.S.C. § 2254(d)(1)). In order to ensure that state prisoners receive vigorous review of their unadjudicated federal claims, we should require a clear and articulable showing that the federal claim was addressed on the merits.