COMMONWEALTH *vs.* BENJAMIN LAGUER.

Worcester. January 8, 1991. - May 14, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Assistance of counsel. *Evidence*, Relating to delibera-
tion by jurors. *Jury and Jurors. Practice, Criminal*, Deliberation of
jury.

A defendant convicted of rape did not demonstrate that he was denied
effective assistance of counsel by his counsel's failure to obtain a pre-
trial test of the defendant's blood type where that evidence would have
made the Commonwealth's case more compelling than it was without
the evidence. [91-93]

In a criminal case, trial counsel was not shown to have provided the de-
fendant ineffective assistance by failing to call four alibi witnesses, in
addition to the two who did testify, where their testimony would have
been inconsistent and would have contradicted the defendant's testi-
mony and otherwise would have been vulnerable to cross-examination.
[93]

At a criminal trial, defense counsel's failure to present expert testimony
with respect to the possible effect mental illness may have had on the
victim's cognitive skills and the reliability of her testimony presented no
ground for a claim of ineffective assistance where such evidence was at
best speculative. [93-94]

A criminal defendant did not demonstrate that he was entitled to a new
trial on the basis of ineffective assistance of counsel where his conten-
tions were predicated on facts not established or were grounded on
mere speculation with regard to likely prejudice. [94]

In a criminal case, the judge correctly denied the defendant a hearing on
his motion for a new trial where a juror's affidavit submitted in support
of the motion did not assert that the jury were improperly exposed to
"extraneous matter" within the meaning of *Commonwealth* v. *Fidler*,
377 Mass. 192 (1979) [94-97]; however, a hearing was required with
respect to the truth or falsity of allegations in the affidavit that one or
more of the jurors, during their deliberations, made statements indica-
tive of ethnic bias, and thus could not be considered impartial [97-99].

INDICTMENTS found and returned in the Superior Court Department on August 4, 1983.

A motion for a new trial, filed on February 24, 1989, was heard by *Robert V. Mulkern*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

The defendant, pro se, submitted a brief.

O'CONNOR, J. After a jury trial, the defendant, an Hispanic male, was convicted of aggravated rape, robbery, breaking and entering, and assault and battery. The Appeals Court affirmed the convictions, 20 Mass. App. Ct. 965 (1985), and thereafter the defendant filed several motions including a motion for a new trial which he filed in 1989. That motion was denied by the trial judge, and the defendant appealed. We transferred the case from the Appeals Court to this court on our own motion. We now vacate the order denying the motion for a new trial and remand this case to the Superior Court for an evidentiary hearing and determination whether, as asserted in a juror's affidavit, another juror made statements immediately after the jury was impanelled and during deliberations demonstrating bias against the defendant on account of ethnic origin. Apart from the ethnic bias issue, we agree with the judge's disposition of the several issues raised by the defendant's motion. We discuss these issues below.

We briefly summarize the victim's relevant trial testimony. The victim was a fifty-nine year old white woman who, at the time she was attacked, lived in the apartment adjacent to an apartment occupied by the defendant. On the evening of July 12, 1983, a man, whom the victim identified as the defendant, dressed only in jogging shorts and "gym" socks, entered her apartment, struck her, threw her to the floor, and repeatedly raped her over a period of eight hours. He robbed her as

well. The principal issue at trial was the identity of the attacker.

In support of his motion for a new trial, the defendant argued to the motion judge, who also had presided at the trial, and argues on appeal, that his trial counsel had been ineffective in the constitutional sense, and also that, due to ethnic prejudice, the defendant was not tried by an impartial jury. We deal first with the ineffective assistance of counsel contention. The defendant specifies several alleged failures on the part of counsel in support of his contention. One of those is said to be counsel's failure to obtain a pretrial test of the defendant's blood type. The judge conducted an evidentiary hearing with respect to that issue and made findings which we incorporate in our discussion below.

The police discovered an athletic sock at the scene of the crime. No evidence was presented at the trial regarding blood or other body fluids on the sock. Also, the defendant's blood type was not in evidence. The judge's memorandum of decision states as follows: "A pre-trial laboratory examination of the sock by a state chemist indicated that a body fluid, then believed, by the examiner to be perspiration was deposited by a person having blood type 'O.' About 85 percent of the population are 'secretors' meaning that their blood type can be determined by an analysis of most body fluids including saliva. Both the victim and the defendant are 'secretors.'

"Prior to trial, the defendant believed that he had blood type 'O.' The defendant's Army records indicate that he has blood type 'O.' No pre-trial blood test was run on the defendant. However, a post-trial blood test indicated that the defendant had blood type 'B.' The defendant, therefore, contends that if his blood type had been tested and then compared with the blood type found on the sock it would not have matched, and the jury could have reached a different verdict in this case."

The judge acknowledged that without the benefit of the evidence presented at the motion hearing, the defendant's point appeared to be a good one. However, the judge re-

ported, the State chemist who had conducted the pretrial examination of the sock testified at the hearing that the secretions on the sock were not necessarily perspiration but were consistent with "those found in the oral cavity." Because there was evidence at trial that the sock had been used to gag the victim, a secretor with blood type "O," the judge reasoned that "[h]ad the blood type analysis obtained posttrial been presented at trial, the jury would have been warranted in finding that the type 'O' blood was deposited on the sock via the victim's saliva." Furthermore, according to the judge's findings, "an additional post-trial test[ ] detected traces of both blood types 'O' and 'B' on the sock . . . therefore[ ] accurately detect[ing] both the victim's blood type, found in the saliva on the sock, and the defendant's blood type, found in perspiration on the sock."

There was further evidence relative to blood tests and types presented at the motion hearing that had not been presented at trial. Certain tissues, found next to the couch near which the victim claimed to have been raped, were found in a pretrial test to have contained type "B" blood. Evidence was presented at trial that several days after the attack the defendant was observed to have scratches on his back and arms and that there was blood underneath the victim's fingernails. The judge concluded that, if defense counsel had discovered and presented evidence at trial that the defendant had type "B" blood, the jury would have been warranted in finding that the tissues were used by the defendant. The judge was satisfied, we think with good reason, that had defense counsel introduced in evidence his client's "B" blood type and the sock, thus inviting the sort of evidence presented at the motion hearing, "the Commonwealth's case against the defendant would have been more compelling" than it was in the absence of that evidence. Thus, counsel's failure to discover that the defendant had type "B" blood, even if it could be said to have "fall[en] measurably below that which might be expected from an ordinary fallible lawyer," which we do not intimate, clearly did not "depriv[e] the defendant of an otherwise available, sub-

stantial ground of defense," a necessary prerequisite to a successful claim of ineffective assistance of counsel. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

A second example of ineffective assistance of trial counsel argued by the defendant is counsel's failure to call four alibi witnesses in addition to the two that did testify. We need not discuss this contention at length. Trial counsel had available the report of an investigator dated three days after the attack setting forth the results of interviews with the four witnesses that the defendant faults his lawyer for not presenting to the jury. The judge determined that the report demonstrated that, because of lack of memory as to relevant dates, one of the four witnesses would have been "vulnerable to cross-examination," and the testimony of the other witnesses, if consistent with the investigator's report, would have been inconsistent and would have contradicted the defendant's testimony. "Given the potential for contradiction and/or embarrassing impeachment contained in the [report]," the judge observed, "trial counsel may have come closer to the ineffective assistance line if he had called [the witnesses]." We detect no error in the judge's reasoning.

The next allegation of ineffective assistance of counsel focuses on trial counsel's failure to present expert testimony on the effect that schizophrenia may have had on the victim's cognitive skills and thus on her reliability as a witness. In support of his contention that counsel should have presented that kind of evidence, the defendant submitted an expert's affidavit describing the manner in which schizophrenia "may impair the capacity of an individual to accurately report events in a legal setting." Neither the expert's affidavit nor anything in the record demonstrates that there was evidence available to trial counsel that the victim's mental condition at the time of the attack or at the time of the trial was such that the expert's opinion was relevant to this case and therefore would have been admissible. Thus the judge was correct in observing that "[t]he defendant's position is at its best speculative," and he was correct in rejecting the defendant's

assertion that counsel was ineffective because he failed to present the type of evidence set forth in the affidavit.

We have examined the defendant's remaining contentions relative to claimed ineffective assistance of counsel and we are satisfied that they are not meritorious. Discussion is unnecessary beyond our observing that the defendant's claims based on counsel's failure to demand that the Commonwealth produce the assailant's underpants and counsel's failure to argue to the jury about the Commonwealth's not having tested and preserved certain semen samples taken from the victim are either predicated on facts that have not been established or are grounded on mere speculation with regard to likely prejudice. We conclude that the defendant has not demonstrated that he is entitled to a new trial on the basis of ineffective assistance of counsel.

We turn now to a more difficult issue. In connection with his motion for a new trial, the defendant requested the judge to determine whether the verdict was so tainted by ethnic prejudice as to require a new trial. The defendant provided the judge with an affidavit of William P. Nowick, one of the jurors at the defendant's trial. The affidavit was dated July 18, 1988, approximately four and one-half years after the defendant's convictions, and it contained the following information. Nowick voted "with reservation" to convict the defendant. "Before and during the jury deliberations, countless racial slurs were made in the presence of the jury members about the defendant, Benjamin Laguer. The first instance of a racial slur being uttered was immediately after the jury was impanelled. . . . One juror, [juror X], remarked about the defendant, 'the goddamned spic is guilty just sitting there; look at him. Why bother having the trial.' The jury foreman . . . requested that [juror X] be quiet. . . . Moreover, during the jury deliberations, there was much unsubstantiated speculation about how anyone could have raped someone all night. This time [juror X] stated that 'spics screw all day and night,' and again alluded to the defendant's guilt. Again [the foreman] asked the juror to refrain. . . . In addition to these instances . . . bigoted invectives [were] directed

against the defendant on other occasions. The jury delibera-
tions were plagued by racism. [Juror X] not only made spe-
cific comments, but during deliberations as well as outside
deliberations (for example, at lunch) he would go from one
juror to another invoking racist overtones while discussing
the defendant's guilt. Along with [juror X], at least two
other jurors were particularly relentless in their racist attack
of the defendant. While I can't remember verbatim what was
said, I definitely recall that throughout the trial I, along with
other jurors, was constantly bombarded with racist attacks of
the defendant uttered by other jury members."

Nowick's affidavit went on: "During the jury deliberations
there was a great deal of discussion, without any evidence
being given at trial, about the reason for the defendant's dis-
charge from the Army. Jury members speculated that sexual
misconduct caused the discharge, and that Mr. Laguer had
been residing with a woman during his tour-of-duty in Ger-
many. However, none of these issues were presented during
trial, or have any basis in fact. . . . Furthermore, other extra-
neous information was discussed by the deliberating jurors,
such as the arrogant and conceited attitude of the defense
counsel, and the probability that the defendant would only
serve five years with two years probation if found guilty. Ref-
erences alluding to the defendant's guilt were repeatedly
made prior to the completion of the Commonwealth's case. . . .
Other slurs made by the deliberating jurors concerned the
one alibi witness, Miguel Gonzalez, whom jury members re-
ferred to as 'a goddamned fool' and 'a lying son of a bitch;'
'not an alibi witness at all.' Criticism was directed against
the defense counsel for not producing more alibi witnesses,
which none of the jury members knew existed until the post-
trial motions for new trial. . . . The deliberations were tainted
with blatant racism, and extreme lack of objectivity, and
speculations without evidence. Had the jury deliberated with
all the evidence, I believe the result would have been
different."

In his memorandum of decision, the judge thoroughly dis-
cussed the Massachusetts rule on juror impeachment first ar-

ticulated in *Woodward* v. *Leavitt*, 107 Mass. 453, 460 (1871), and more recently discussed at length and applied in *Commonwealth* v. *Fidler*, 377 Mass. 192 (1979). In *Fidler*, *supra* at 196, we made clear that "our rule does not create an absolute prohibition against juror testimony to impeach a verdict [and that] juror testimony is admissible to establish the existence of an improper influence on the jury, but is not admissible to show the role which the improper influence played in the jury's decisions." We reasoned that "an inflexible rule excluding all juror testimony offered to impeach verdicts achieves stability at the expense of doing justice between the parties — a result not consistent with the ideal of trial by an impartial jury." *Id.* at 197. Our decision in *Fidler* "does not permit evidence concerning the subjective mental processes of jurors, such as the reasons for their decisions. However, . . . '[w]here overt factors are present by which the verdict's validity can be objectively assessed, the law's commitment to a just result warrants receiving evidence as to the alleged acts of misconduct." *Id.* at 198. We concluded in that case that, while Fidler was not entitled to a hearing concerning whether the jury followed the trial judge's instructions or concerning whether a juror made a general comment about people who "run around with guns," *id.* at 198-199, because "[w]e cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies," *id.* at 199, quoting from *Government of the V.I.* v. *Gereau*, 523 F.2d 140, 148 (3d Cir. 1975), cert. denied, 424 U.S. 917 (1976), Fidler was entitled to a hearing on the question whether "one juror improperly introduced extraneous matter into the jury room by stating that Fidler had been shot at a month earlier." *Id.* at 200-201. We placed the burden on Fidler to prove that the jury were exposed to the extraneous matter as alleged, and we held that, if he were to carry that burden, the burden would then "shift[ ] to the Commonwealth to show beyond a reasonable doubt that Fidler was not prejudiced by the extraneous matter." *Id.* at 201.

In arriving at a decision that the defendant in this case is not entitled to an evidentiary hearing concerning the truth of the matters asserted in juror Nowick's affidavit, the judge reasoned that the statements assertedly made by juror X and other jurors did not relate to "specific readily identifiable facts or actions as opposed to evidence of subjective mental attitudes on the part of a juror." The judge "accept[ed] as true solely for the purpose of [his] rationale that the juror made the abhorrent statements attributed to him," but he concluded that the teaching of the *Fidler* case is that an evidentiary hearing would be inappropriate.

We agree with the judge that the statements attributed by Nowick in his affidavit to juror X and other jurors did not relate specific factual information that might influence the fact-finding of reasonable jurors. The main, although not exclusive, thrust of the affidavit, even including the assertions that the jury speculated about the defendant's early departure from the Army because of sexual misconduct and his having lived with a woman in Germany, was more indicative, if true, of the jurors' ethnic bias, a matter of attitude, than of purported authoritative information unfavorable to the defendant.

Juror bias is not an "extraneous matter" within the *Fidler* rule. *Commonwealth* v. *Grant*, 391 Mass. 645, 653 (1984). Nevertheless, despite our agreement with the judge that Nowick's affidavit does not assert that the jury were exposed to extraneous matter within the rule of *Fidler*, we conclude that the trial judge, or a different judge if the trial judge should be unavailable, ought to conduct a hearing to determine the truth or falsity of so much of Nowick's affidavit as bears on jurors' ethnic bias. We are persuaded that the possibility raised by the affidavit that the defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd*, 366 U.S. 717, 722 (1961). See *Commonwealth* v. *Tavares*, 385 Mass. 140, 156 n.25, cert. denied, 457 U.S. 1137 (1982) ("to ignore the

evidence [of the influence of racial bias in the jury room] might well offend fundamental fairness"); *Commonwealth* v. *Fidler, supra* at 197.

The defendant contends that "the trial judge made a finding as to the truth of Mr. Nowick's affidavit." We reject that contention. It is noteworthy that, in introducing his discussion of the "Fidler" question in his memorandum of decision, the judge implied less than full acceptance of the truth of the affidavit by characterizing it as "an eight paragraph typed affidavit dated July 18, 1988 . . . couched in legal language, e.g., 'Further, other extraneous information was discussed by the deliberating jurors. . . . The deliberations were tainted with blatant racism, and extreme lack of objectivity, and speculations without evidence.' The affidavit states that the jurors in their deliberations anticipated matters now raised in this motion for a new trial, e.g. 'Criticism was directed against the defense counsel for not producing more alibi witnesses, which none of the jury members knew existed until the post-trial motions for new trial.' " Furthermore, even without reference to those observations, we think it is clear from the judge's statement, "I accept as true solely for the purpose of this rationale that the juror made the abhorrent statements attributed to him," that the judge assumed, without deciding, the truth of the affidavit.

The only question on remand will be whether the revelations or disclosures in Nowick's affidavit of ethnically oriented statements having been made by one or more jurors are essentially true. We recognize that the ultimate concern is whether any juror in fact harbored ethnic bias against the defendant. We also recognize the possibility (though not a probability) that statements such as those attributed to juror X, as tasteless as they were, were only jocular in nature and did not reveal a true prejudice. However, we think that, if the judge were to find on remand that the Nowick affidavit is essentially true, to the extent it purports to repeat ethnically oriented statements of jurors, it would be unrealistic to expect the judge to resolve with confidence a further question as to whether the juror or jurors charged in the affidavit with

having made those statements were or were not, in fact, ethnically biased. Surely, there may be instances in which a juror's personal interest in the outcome of a case may be explored and determined after the fact, see, e.g., *Smith* v. *Phillips*, 455 U.S. 209 (1982), but we think that a determination, especially one that is made several years following a verdict, concerning the existence of actual ethnic prejudice among the jurors cannot confidently be made. As Justice O'Connor observed in *Smith* v. *Phillips*, *supra*, "[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Id.* at 221-222 (O'Connor, J., concurring). We think that the "difficulty" translates into an "impossibility" when the bias in question is ethnic or racial in nature and the inquiry occurs years after the event.

Therefore, the order denying the defendant's motion for a new trial is vacated and the case is remanded to the Superior Court solely for the purpose of conducting an evidentiary hearing and making a determination with respect to the truth of the Nowick affidavit in so far as it describes ethnically oriented statements attributed to jurors. If the affidavit is found to be essentially true in that regard, the defendant shall be entitled to a new trial. Otherwise, the motion for a new trial should be denied.

*So ordered.*