SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. PEDRO VASQUEZ [1]

 
 Docket:
 SJC-13578
 
 
 Dates:
 October 11, 2024 - January 28, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Homicide. Jury and Jurors. Constitutional Law, Jury, Impartial tribunal. Practice, Criminal, Jury and jurors, Conduct of juror, Examination of jurors, Deliberation of jury.
 
 

             Indictments found and returned in the Superior Court Department on April 30, 2015.
            The cases were tried before William J. Ritter, J.
            After review by the Appeals Court, 103 Mass. App. Ct. 1114 (2023), the Supreme Judicial Court granted leave to obtain further appellate review.
            Ashley P. Allen for the defendant.
            David L. Sheppard-Brick, Assistant District Attorney, for the Commonwealth.
            Chauncey B. Wood, Katharine Naples-Mitchell, Kevin S. Prussia, Annaleigh E. Curtis, & Christopher R.D. Stevenson, for Massachusetts Association of Criminal Defense Lawyers & another, amici curiae, submitted a brief.
            BUDD, C.J.  During jury deliberations in the defendant's murder trial, an argument between two jurors led to allegations of racial bias.  Although the judge made a limited inquiry into the matter, because we conclude that it was insufficient to satisfy the protections under the Massachusetts Declaration of Rights to a fair and impartial trial, we vacate the defendant's conviction and remand for a new trial.[2]
            Background.  1.  Facts.  We recite the facts of the case as the jury could have found them.  On January 5, 2015, around 5:40 A.M., Springfield police officers responded to a call for shots fired.  The officers observed a black Jeep with the victim, Yahaira Hernandez, sitting in the driver's seat with a fatal gunshot wound to the back of her head.
            Police recovered surveillance footage from a home security camera located across the street from the murder scene that partially captured audio and video footage of the unfolding events.  The recording showed the Jeep come to a stop in the right side of the frame.  Approximately four minutes and thirty seconds later, the rear driver's side door was opened, and the camera recorded an argument in Spanish between a male and a female, a gunshot, and the shooter fleeing the scene on foot.  As no physical evidence connected the defendant to the crime, the Commonwealth relied on the surveillance video to prove the defendant's identity as the shooter.[3]  However, the audio and visual quality of the video were poor, and the defendant challenged the reliability of eyewitness identifications, as well as English translations of the audio prepared by expert witnesses.
            2.  Jury deliberations.  The jury began their deliberations on a Friday afternoon -- the tenth day of trial -- and deliberated for approximately two hours before the judge suspended deliberations for a long weekend.  A court officer observed the juror in seat 2 (juror no. 2) and the juror in seat 4 (juror no. 4) arguing outside the jury room.  Not long afterwards, both the court officer and the prosecutor in the case witnessed a further altercation between the two jurors from a court house window.
            The morning of the next court day, the judge informed the parties that he had received notes from two jurors.  One was from juror no. 4, who alleged that after the jury were discharged for the weekend, juror no. 2 initiated a verbal argument on the sidewalk outside the court house during which juror no. 2 called juror no. 4 racist.[4]  The second note was from the foreperson of the jury and stated in part that one of the jurors had "multiple interactions" with other jurors that "became personal."  The note further stated that "[t]here seems to be preconceived biases with this juror, which he has voiced to the group."[5]  
            The judge conducted a voir dire with juror no. 2, juror no. 4, and the foreperson.  Juror no. 2 confirmed that he had accused juror no. 4 of being racist.  Juror no. 2 explained that he "did not assume [juror no. 4] was a racist based on one statement"; rather, "there were other statements and incidences [sic] within the deliberations."  Juror no. 2 also disclosed that juror no. 4 called him a "piece of shit," after which juror no. 2 suggested that they go to the parking garage to "fight it out."  Juror no. 4, during his voir dire, confirmed that the argument concerned something that happened during deliberations.  Juror no. 4 corroborated juror no. 2's recounting of the interaction outside the court house and stated his belief that juror no. 2 wanted to fight him.
            When the foreperson was questioned, she explained that while leaving the court house on Friday, she observed juror no. 2 call out to juror no. 4 that they needed to "have some words" before the foreperson walked away.  She also mentioned that several jurors spoke to her about uncomfortable tension in the room.  Outside the presence of the foreperson, the prosecutor requested that the judge ask about the "preconceived biases" that the foreperson mentioned in her note, but the judge declined to do so, stating, "I'm not inclined to intervene as to the internal workings of this group."
            After hearing from the three jurors, each of whom stated that they could remain impartial, the prosecutor suggested that both juror no. 4 and juror no. 2 be discharged, due to the "allegations of racism and threats of physical violence."  Trial counsel suggested that because both jurors indicated that they could be fair and impartial, it would be "extremely premature based on what we've heard, to consider excusing either of the jurors."
            The prosecutor also raised the possibility that other members of the jury may have been affected by the dispute between the two jurors, which began in the deliberation room.  Trial counsel offered that an individual voir dire could be conducted if the judge thought it was appropriate, or alternatively the judge could reinstruct the jury regarding their duty to listen to one another and "discuss the evidence appropriately."  The judge ultimately decided not to discharge either juror no. 2 or juror no. 4.[6]  The judge did not address directly the possibility of conducting an individual voir dire.  He did, however, reinstruct the jury before they began their second day of deliberations regarding the deliberative process and impartiality, generally.[7]
            Later that same day the jury returned a verdict of guilty of murder in the second degree.  The defendant timely appealed, and a panel of the Appeals Court affirmed his conviction in an unpublished opinion.  See Commonwealth v. Vasquez, 103 Mass. App. Ct. 1114 (2023).  This court granted the defendant's application for further appellate review.
            Discussion.  "The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury" (citation omitted).  Commonwealth v. McCowen, 458 Mass. 461, 494 (2010).  See Aldridge v. United States, 283 U.S. 308, 314 (1931) ("if any [juror] was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit").  "While '[a]ll forms of improper bias pose challenges to the trial process,' . . . racial and ethnic bias 'implicate[] unique historical, constitutional, and institutional concerns.'"  Commonwealth v. McCalop, 485 Mass. 790, 798-799 (2020), quoting Peña-Rodriguez v. Colorado, 580 U.S. 206, 224 (2017).
            Having received information regarding discord in the jury room that potentially was based on racial bias, the judge conducted a limited voir dire of juror no. 4, juror no. 2, and the foreperson.  During the voir dire of the three jurors, the judge was careful to steer each juror clear of discussing the content of the deliberations.  See Commonwealth v. Ralph R., 490 Mass. 770, 781 (2022), citing Commonwealth v. Quiles, 488 Mass. 298, 316 (2021), cert. denied, 142 S. Ct. 1237 (2022) ("the judge appropriately 'investigated the comments without prying into the jury's deliberations'").  Based on the information gathered, the judge was made aware that, among other things, (1) the disagreement between juror no. 4 and juror no. 2 began during deliberations; (2) juror no. 2 came to believe that juror no. 4 was racist based on comments that the latter made during deliberations "in front of everybody"; and (3) the foreperson noted that one of the jurors "seem[ed]" to have "preconceived biases . . . which he has voiced to the group."
            In light of this information, it was incumbent on the judge to inquire about the content of the statements at issue in order to determine whether they were racially biased as alleged.[8]  See Commonwealth v. Laguer, 410 Mass. 89, 97 (1991) ("the possibility . . . that defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored").  See also Ralph R., 490 Mass. at 784 (same).  If the statements suggested racial bias, the next step would have been to assess the impartiality of the juror who made the statements to determine whether the juror was actually biased.[9]  Cf. McCowen, 458 Mass. at 496 ("Generally . . . the judge must determine the precise content and context of the statement to determine whether it reflects the juror's actual racial or ethnic bias, or whether it was said in jest or otherwise bore a meaning that would fail to establish racial bias").  Finally, regardless of whether the statements confirm actual bias on behalf of the juror who uttered them, an individual voir dire of each of the other jurors was required to determine which, if any, heard the statements in question, and whether those who had were able to remain fair and impartial.  See Commonwealth v. Jacobs, 488 Mass. 597, 608 (2021) ("When a trial judge learns that the jury were exposed to an extraneous influence, the judge is required to determine whether the jurors are able to remain impartial"); Quiles, 488 Mass. at 316 (judge properly asked "each juror whether he or she could continue impartially" in light of juror's racist comments); Commonwealth v. Tavares, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982) (judge "acted properly when he asked each deliberating juror whether he had heard any racist comments").
            Here, both parties and the judge acknowledged the possibility that racial bias had been expressed during deliberations.  The prosecutor noted that, regardless of whether juror no. 2 and juror no. 4 were discharged, the question remained whether the other jurors were exposed to bias.  The judge himself expressed concern over "the infiltration of potentially racist issues in this case."  And, although trial counsel did not insist, he raised the possibility of an individual voir dire of the remaining jurors.
            Because juror no. 2 provided information "reasonably suggest[ing]" that juror no. 4 openly espoused racist views during the deliberative process, the failure to fully investigate the allegation of racial bias was an abuse of discretion.[10]  See Ralph R., 490 Mass. at 783-784 (judge must assess report of potential bias "fully equipped with the information necessary to make such a determination").[11]  It is clear that the judge attempted to walk what we have noted is a delicate line, but more was required here.[12]
            "Errors that undermine the right to an impartial jury are structural errors."  Commonwealth v. Grier, 490 Mass. 455, 464 (2022).  If properly raised and preserved, a defendant claiming such an error need not demonstrate any specific prejudice to obtain relief, but is instead entitled to "automatic reversal."  Commonwealth v. Williams, 481 Mass. 443, 455 (2019).  Here, however, because the defendant did not timely object to the course of action taken by the judge, he waived the claim of juror bias.  See Ralph R., 490 Mass. at 785 (structural errors can be waived).  We therefore review the error for a substantial risk of a miscarriage of justice.  Id. at 786.
            "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence' the guilty verdict" (alteration omitted).  Commonwealth v. Alphas, 430 Mass. 8, 13 (1999), quoting Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).  To make this determination, we consider "the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision."  Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005).
            We begin by noting that the Commonwealth's evidence was relatively strong.  Although no physical evidence tied the defendant to the crime scene, and he presented evidence of an alibi, multiple witnesses familiar with the defendant identified him as the person depicted in the video shooting the victim, and some witnesses who listened to the audio of the surveillance video testified to hearing the victim say the name "Pedro."
            However, in these circumstances, the strength of the case against the defendant is outweighed by the nature and significance of the error given the allegations of racial bias infecting jury deliberations.[13]  "Racial bias in the jury system is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice."  McCalop, 485 Mass. at 798.  Based on the record, we do not know what comments were made, whether the juror who made them was racially biased as alleged, whether any other jurors were exposed to the statements, and, if so, whether the statements materially influenced the guilty verdict.  Simply put, the circumstances here -- where a juror has alleged that racially biased comments related to the deliberations were made and that those comments were the cause of a conflict that evidently spilled out of the jury room -- establish too great a risk to bear that a juror was racially biased against the defendant and openly shared such views with his fellow jurors while deliberating on the defendant's guilt or innocence.  As such, we must conclude that the incident created a substantial risk of a miscarriage of justice.[14]  See id. at 791 ("A guilty verdict arising from racial or ethnic bias not only poses a substantial risk of a miscarriage of justice but also, 'if left unaddressed, would risk systemic injury to the administration of justice'" [citation omitted]).
            The Commonwealth acknowledges that the jurors' disclosures raised the possibility of bias and, thus, that the judge was required to make a "meaningful inquiry" into whether improper statements were made and, if so, whether they infected deliberations.  The Commonwealth nevertheless insists that the error could not have created a substantial risk of a miscarriage of justice because the defendant failed to object to the way the judge handled the matter.[15]  This suggested result is not in keeping with our common-law application of the substantial risk of a miscarriage of justice standard.  As discussed supra, the consequence of the defendant's failure to insist on a voir dire of the entire jury to root out potential racial bias at trial is that on appeal the claim does not automatically result in a new trial, but instead is subject to review for a substantial risk of a miscarriage of justice, which we have applied.  Our common law does not call for any additional penalty.[16]
            Conclusion.  The defendant's convictions of murder in the second degree, unlawful possession of a firearm, and unlawful possession of a loaded firearm are vacated and set aside.  The case is remanded to the Superior Court for proceedings consistent with this opinion.
So ordered.
 
footnotes

 
            [1] We spell the defendant's name as it appears in the indictment.
            [2] We also vacate the defendant's convictions of unlawful possession of a firearm and unlawful possession of a loaded firearm in accordance with our holding in Commonwealth v. Guardado, 491 Mass. 666, 693, S.C., 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024).
            [3] The defendant presented evidence of an alibi, specifically, his daughter and ex-wife testified that he was home with them during the time the victim was killed.
            [4] The note from juror no. 4 stated:
"On Friday, February 14th, at 4:15, as I was outside heading through the crosswalk outside of the Court building, Juror number 2 . . . yelled for me as he was coming down the last three steps.  He eventually caught up to me on the sidewalk across the street and continued a confrontation that started during deliberation.  On the sidewalk, it turned into more than words and moved to threats.  He continued to provoke me and was trying to start a physical altercation, which I began to walk away from.  He got back in front of me when I was near some other gentlemen, who were on the corner.  He called me a racist in front of them and continued to provoke me.   It was now a four-on-one situation of continued threats.  I quickly walked away and was not pursued."
            [5] The note from the foreperson stated:
"During Friday's deliberations, there were multiple times I had to remind a person that needed [sic] to leave his personal feelings out of it.  However, this one had multiple interactions with others, and it became personal between them.  This actually continued outside, after we left.  There seems [sic] to be preconceived biases with this juror, which he has voiced to the group.  I will start today with reminding them again about leaving their emotions and personal experiences out of the conversation, but I'm not sure if there is [sic] other steps I need to take, other than your instructions."
            [6] The judge stated:  "There needs to be really compelling reasons, and I don't think we're there yet at this stage."
            [7] After greeting the jury in the morning and inquiring if anyone had discussed the case over the weekend, the judge reiterated some of his previous instructions:
"So, I wish to remind you of some of the statements I gave you in the Final Instructions.  On Page [thirty-six], I stated, 'I trust you each approach deliberations with mutual respect for the opinions of your fellow jurors.  That you have the disposition to listen to each other, to be convinced as to one another's arguments, and persuaded as to one another's views.'
"On Page [twenty-three], I stated, 'You should determine the facts based solely on a fair consideration of the evidence.  You are to be completely fair and impartial.  You are not to be swayed by prejudice or by sympathy, by personal likes or dislikes, towards either side.  You are to consider the evidence in a calm, dispassionate, and analytical manner.'
"Lastly, on Page [thirty-four], I instructed you, 'As jurors, you have taken the oath to follow the law.  I instruct you that the law says you must separate any emotional reaction on your part from the informational value and weight of the evidence.  You may not find facts or base your decision on sympathy, anger or pity for or against either side in this case.  Rather, your verdict must be based solely on the evidence in this case and my instructions on the law, which I have provided to you.'
"So, I give you that additional instruction as you work through the day's deliberations, and you are required to consider these instructions, along with all of the other instructions that I previously gave you, for which you have a copy in the Jury Room."
            [8] We have long held that judges may inquire of jurors to ascertain necessary information relating to a claim that the jury may not have been impartial, including both the substance of any biased statements and their impact on any juror's impartiality.  See Commonwealth v. Tavares, 385 Mass. 140, 153-156, cert. denied, 457 U.S. 1137 (1982).  Indeed, Mass. G. Evid. § 606(b) was updated after our holding in Tavares to permit judges to receive evidence concerning whether any juror "made a statement that reasonably demonstrates racial or ethnic bias."  Cf. Quiles, 488 Mass. at 316 (judge did not err in conducting individual voir dire of jurors, investigating comments without prying into deliberations).
            [9] Because we conclude, infra, that the insufficient investigation into the allegations of bias created a substantial risk of a miscarriage of justice, we need not decide whether it was error for the judge not to dismiss juror no. 4, the subject of the bias allegations.  However, we note that to the extent juror no. 4 declared himself impartial, the judge's ability to assess such a declaration was impaired because the judge did not know what the statements were.  Cf. McCowen, 458 Mass. at 496 ("In some instances, the statement made by the juror may establish so strong an inference of a juror's actual bias that proof of the statement alone may suffice").
            [10] As "[j]udges are afforded broad discretion in addressing issues concerning juror impartiality that arise during trial," we review a judge's decision to investigate such claims of racial or ethnic bias for an abuse of discretion.  Ralph R., 490 Mass. at 782, citing Commonwealth v. Alicea, 464 Mass. 837, 848-849 (2013).  Accord United States v. Villar, 586 F.3d 76, 87 (1st Cir. 2009) (judge has discretion to hear juror testimony "to determine whether ethnically biased statements were made during jury deliberations").
            [11] Although this trial occurred before our decision in Ralph R., we held in McCowen, 458 Mass. at 496-497, a case decided a decade before this trial, that a judge's duty to investigate claims of bias extends beyond identifying any actually biased juror to investigating "whether the statements so infected the deliberative process with racially or ethnically charged language or stereotypes that it prejudiced the defendant's right to have his guilt decided by an impartial jury on the evidence admitted at trial."
            [12] This is not to say that "an individual inquiry of each deliberating juror is required in every instance where there is a preverdict allegation of jury bias."  Ralph R., 490 Mass. at 781-782.  Judges retain broad discretion in evaluating claims of bias and, certainly, after investigation, may conclude that the claim is not credible and that no further inquiry is necessary.  We have cautioned, however, that initial credibility determinations require some investigation and judges "should explain on the record the basis for that credibility determination."  Id. at 783, 785 (judge erred in finding bias report "insincere" without any inquiry).
            [13] Based on the record, we do not consider trial counsel's tactical choices as a factor weighing against the defendant in this analysis.  See note 15, infra.
            [14] We reached the same conclusion in Ralph R., 490 Mass. at 786, where an insufficient investigation into a preverdict report of racial bias created a substantial risk of a miscarriage of justice.
            [15] The Commonwealth's claim that the defendant opposed the prosecutor's request that the judge conduct further inquiry of racial bias is not supported by the record.  Although trial counsel objected to removing juror no. 2 and juror no. 4, he did not oppose further inquiry into racial bias.  To the contrary, trial counsel was the one who suggested individual voir dire as one potential course of action, in addition to reinstructing the jury.  When the judge decided to simply reinstruct the jury, neither party objected.
            [16] We also reject the Commonwealth's suggestion that we remand the case to the Superior Court for a postverdict hearing pursuant to McCowen, 458 Mass. at 494-497.  As discussed supra, the proper procedure to follow when a preverdict concern is raised regarding racial bias in the deliberation room is well established.  See Ralph R., 490 Mass. at 781 (noting approval of "the procedure set forth in Tavares in response to a preverdict report of jury bias").  We previously have declined to require the postverdict McCowen procedure where judges have conducted preverdict inquiries.  See Quiles, 488 Mass. at 316-317.  We are not persuaded to do so here.  Cf. Laguer, 410 Mass. at 94-95 (1991) (remand to determine actual prejudice amongst jurors particularly difficult "when the bias in question is ethnic or racial in nature and the inquiry occurs years after the event").